**UNITED STATES of America, Plaintiff,**

v.

**Eric GILMER, Defendant.**

**Cr. No. 92–CR–32.**

United States District Court,
D. Colorado.

May 21, 1992.

Charlotte J. Mapes, Denver, Colo., for plaintiff.

Warren R. Williamson, Asst. Federal Public Defender, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

The original four-count indictment in this case charged that defendant (1) possessed marijuana, intending to distribute it; (2) possessed crack cocaine, intending to distribute it; (3) possessed a semi-automatic pistol in connection with these drug trafficking crimes; and (4) received this pistol while state assault and accessory-to-murder charges were pending against him. The charges arose out of an encounter between defendant and Denver police which occurred on January 20, 1992. During this encounter, the police arrested defendant for drunk driving and seized the marijuana, crack cocaine, and a pistol from a rental car to which he had the keys. The grand jury returned its original indictment on January 28, 1992.

On January 29, 1992, federal and state law enforcement officers executed the federal arrest warrant issued on the original indictment. They also searched the apartment house (4900 East 33rd Avenue) from which defendant had just emerged at the time of his arrest. Based on evidence found during this search, the grand jury returned a superseding indictment which added three new counts to the original indictment—two involving possession of drugs with intent to distribute, and one involving possession of four weapons during a drug trafficking offense.

The matter is now before the court on defendant's motion to suppress evidence. Defendant moves to suppress the following: (1) documents, crack cocaine, marijuana, and any other controlled substances taken from the rental car on January 20, 1992; (2) the firearm taken from the same rental car on the same date; (3) the crack cocaine and other controlled substances taken from the apartment at 4900 East 33rd Avenue after defendant was arrested on January 29, 1992; (4) the firearms and other evidence taken from that apartment on the same date; and (5) any statements made by defendant to police officers when he was arrested on January 29. Defendant claims that all these materials must be suppressed because they are the product of law enforcement officers' violations of the Fourth, Fifth, and Sixth Amendments to the United States Constitution.

The court held a suppression hearing on April 17, 1992, which continued on April 22, 1992. The facts hereinafter recited constitute the court's factual findings concerning suppression issues. After reviewing the testimony presented at the hearing and examining the briefs filed by the parties, I have arrived at three conclusions concerning the issues presented by the motion to suppress. *First,* defendant was legally detained on January 20, 1992. The subsequent search of the rental car was therefore not tainted by any illegal detention, and defendant had no expectation of privacy in that car which would allow him to challenge the legality of the search on any other ground. *Second,* the Government did not meet its burden of proving that there was voluntary, effective consent to the extensive search of the apartment at 4900 East 33rd Avenue on January 29, 1992. *Third,* the Government did not meet its burden of proving that defendant volun-

tarily waived his constitutional rights when he answered questions following his arrest.

## FACTS

### THE EVENTS OF JANUARY 20, 1992

On January 20, 1992, at approximately 2:00 o'clock a.m., Denver Police Officer Mark Allen was on patrol in the 3300 block of York Street. Officer Allen, who was in uniform, spotted a car traveling north on York Street at a high rate of speed. The car turned in front of a southbound truck, no turn signal having been given, and pulled into the parking lot at Martin's Bar, an establishment well-known to police because of the numerous shootings and disturbances which have occurred there.

As Officer Allen pulled into the parking lot, he watched the driver get out of the car and hastily approach the entrance of the bar. The officer yelled twice, demanding that the driver stop. After the second demand, the driver looked back at the officer. Officer Allen then recognized the person in question as Defendant Eric Gilmer, because of previous drug-related arrests in which they had both been involved. Defendant quickened his pace, and Officer Allen ran to intercept him near the entrance of the bar.

As Officer Allen got close to him, defendant turned away from the officer, toward the wall of the building, and appeared to stuff something into his pants. Based on the prior contacts between them, the officer thought defendant might be armed. Defendant then turned around and approached Officer Allen. "Mark," he said, using Allen's first name, "What's the problem? What's the problem?" This unwanted and unwonted familiarity, together with defendant's apparent nervousness, exacerbated the officer's apprehensions. He therefore drew his weapon and put it in the "ready position" (pointed toward the ground and ready for use if necessary). After instructing defendant to put his hands on a parked car, Officer Allen, who was alone, called for police back-up.

At this point, another person named Leroy Crowley walked toward Officer Allen.

Believing that he needed to retain control of the encounter, the officer instructed Crowley to stand beside defendant and put his hands on the car. While the two were at the car, Officer Allen saw defendant pass a key or keys to Mr. Crowley.

Responding to the call from Officer Allen, Officers Delmonico and Cowgill arrived. The officers performed a pat-down search on both defendant and Mr. Crowley and questioned them about who they were and what they were doing. Officer Allen suspected that defendant had been driving under the influence of alcohol. Defendant's eyes were glossy and bloodshot, he had an alcoholic odor on his breath, and he appeared to be intoxicated. After Officer Cowgill performed the roadside sobriety tests, defendant was placed under arrest for driving while intoxicated.

After defendant's arrest, Officers Allen and Delmonico approached the car that defendant had been driving to determine ownership and to inventory the car. Officer Allen noticed that the license plate started with the letter "Z," which normally indicates a rental car. As the officers looked into the car, they noticed a 35 mm film canister, a container commonly used to conceal drugs. The officers did not ask for defendant's permission to search the car, nor did they obtain a search warrant. Using the key retrieved from Mr. Crowley, the officers opened the car and searched inside, including the compartment between the driver's and front passenger's seats. In their search of the car, the officers found the rental agreement, a loaded handgun, marijuana, and the film canister, which contained crack cocaine. The rental agreement indicated that the car was rented to one Arthur Gilmer, who was born in 1940 and was obviously older than defendant. Defendant was not listed on the rental contract as an authorized driver.

After an unsuccessful attempt to contact the rental car agency, the car was towed to the police car pound—the normal practice for handling rental cars in this situation. Before any car is towed, it is also normal police practice to conduct an inventory search. Based on the items found in the

car, the federal grand jury returned the original four-count indictment in this case. A federal warrant was issued for defendant's arrest.

THE EVENTS OF JANUARY 29, 1992

On January 29, 1992, several agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF) attempted to locate defendant and to execute the arrest warrant. The ATF agents and two Denver Police officers went to an apartment address where they believed defendant lived. The agents told the woman who answered the door that a disturbance had been reported at that address. The statement was a ruse to obtain entry, for no such disturbance had been reported.

A total of five officers and agents entered the apartment and looked around. They did not find defendant. The woman who answered the door, Ms. Brenda Johnson, and her daughter, Lea Johnson, were the only two persons present at that apartment. The agents explained that they were looking for Eric Gilmer. Ms. Brenda Johnson told them that Eric Gilmer, Ms. Johnson's daughter (Ericka), and Ericka's four-year-old son Jeremy lived at an apartment nearby. She told them the block where the apartment was located and gave them a telephone number, but did not know the exact address. With the telephone number, an officer made a call and determined that the exact address was 4900 East 33rd Avenue. Ms. Lea Johnson told the agents that Eric's three-year-old daughter Brittany might also be living at the apartment.

Concerned for the children's safety, the agents devised a ruse to arrest defendant outside the apartment in order to prevent the children from becoming involved. All but one agent left Brenda Johnson's apartment and proceeded to 4900 East 33rd Avenue. According to the plan, the agents and officers took positions outside the apartment. One agent radioed back to Ms. Brenda Johnson's apartment, and Ms. Brenda Johnson telephoned defendant to tell him that the police were on their way.

Approximately five ATF agents and one officer, each with a weapon, were positioned outside 4900 East 33rd Avenue when defendant received the telephone call. At about 7:30 p.m., defendant opened the door, saw the agents, and slammed the door shut. Less than a minute later, evidently in response to demands by the law enforcement officers, defendant opened the door. The agents grabbed him, pulled him outside, and forced him to the ground. Officer Anthony Foster, who was in uniform and armed, handcuffed defendant and forced him to lie face-down in the yard near the doorway to the apartment.

What law enforcement officers next said to defendant is unclear. ATF Agent Philip Miller, who was present, claimed that defendant had been "mirandized." When asked to be specific, the agent could do no better than, "I heard [Officer Foster] say you have the right to an attorney, and if he [sic] could not afford one, he could have one appointed, *so forth*." (Emphasis supplied.) It was obvious that the agent (1) could not remember what Officer Foster said; (2) did not know the content of the warnings required by *Miranda v. State of Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) and could not even pretend that he had heard what was said; and (3) apparently assumed that Officer Foster was reading from some sort of card with the *Miranda* warnings written on it, as the agent always did. For his part, Officer Foster testified to the legal conclusion that defendant was given his *Miranda* warnings. He never specified, and was never asked, what warnings were given or what was said. In any event, I find that interrogation commenced as defendant was front-down on the ground, in a rocking-chair position, his hands cuffed behind him, "looking up at" the officers.

Agent Miller and Officer Foster interrogated defendant. When asked if there were any guns in the apartment, defendant answered yes. When asked if there were any drugs in the apartment, defendant answered no. Officer Foster then took defendant into the apartment and seated him in a chair. Defendant suggested that his girlfriend, Ericka Johnson, should get the weapons for the agents.

Meanwhile, immediately after defendant was yanked from the doorway, Agent Patricia Jones entered the apartment. Upon entering she encountered Ms. Ericka Johnson, the lessee of the apartment, and her four-year-old son. When asked, Ms. Johnson responded that there was no one else in the apartment. Agent Jones took Ms. Johnson by the arm and escorted her and the child into the kitchen, which is a separate room on the main level of the two-level apartment.

"Is this your residence?" Agent Brian Bennett inquired of Ms. Johnson as Agent Jones was leading her to the kitchen. "Do you mind if we search?" Agent Bennett persisted, after Ms. Johnson had indicated that she did live there. "No, I don't mind," she responded. Agent Jones told the other agents to clear the upstairs for any people.

The testimony about what happened next is conflicting, especially the testimony concerning the exact whereabouts of Ms. Johnson during subsequent events. Agent Miller claimed that Ms. Johnson took him upstairs to the children's bedroom. She then pointed mutely to a shelf in a closet and motioned underneath a bunk bed. Agent Miller did not testify as to where she went after that. Agent Miller stayed in the children's room to search. According to Agent Miller's version of events, Ms. Johnson apparently entered the children's room with Agent Miller, was not asked any questions while in the room, did not speak to the agents during this time, and left the room unescorted.

Agent Jones testified that she was with Ms. Johnson after Ms. Johnson acceded to the search. Agent Jones brought Ms. Johnson into the kitchen. Agent Jones stated that Ms. Johnson was not free to go at that time, since the agent still needed to identify who she was. After Agent Jones and Ms. Johnson discussed what was going on, Agent Jones told Ms. Johnson that she was not under arrest and that she was free to leave. Ms. Johnson responded that she wanted to stay.

In her testimony concerning Ms. Johnson's subsequent whereabouts, Agent Jones contradicted herself. On direct and cross-examination, and in response to questioning by the court, Agent Jones testified unequivocally that Ms. Johnson did not go upstairs before the briefcases were discovered. On re-direct examination, Agent Jones testified that she was with Ms. Johnson "most of the time," but that Ms. Johnson did go upstairs with other unnamed agents.

The testimony of Agent Dennis Downs, while not conclusive, tended to support Agent Jones' testimony that Ms. Ericka Johnson remained downstairs and did not accompany Agent Miller upstairs. Agent Downs testified that he had started to search the upstairs after Ms. Johnson had told Agent Miller that she did not mind if the agents searched. Agent Downs was searching the master bedroom upstairs when Agent Miller called him into the children's bedroom. Agent Miller directed him to look under the bed. He retrieved and opened a red-brown briefcase. The briefcase contained cocaine, marijuana, approximately $3600.00 in cash, and a gun. *Agent Downs testified that he did not see Ms. Johnson in the children's bedroom until after the search.* Another agent, Matthew Woods, testified that he thought Ms. Johnson was downstairs the entire time until the police took her through the apartment shortly before they were leaving. Having considered all this testimony, I find that Ms. Ericka Johnson remained downstairs with Agent Jones until after the search had been concluded and the police were about to leave the apartment.

During the search of the children's bedroom, the agents also found a black briefcase on the shelf in the closet. The briefcase contained three loaded weapons and ammunition. During the search the agents also found a scale in the kitchen and other ammunition in various locations. Neither defendant nor Ms. Johnson gave their consent to open either briefcase.

At some later time, after the briefcases had been discovered and opened, Ms. Johnson went upstairs with Agent Jones. Agent Jones explained to Ms. Johnson that they had discovered guns and drugs and asked Ms. Johnson if she would give her

written permission to search. Ms. Johnson asked whether she could refuse. Agent Jones explained to Ms. Johnson that they would be able to secure the premises, obtain a search warrant, and eventually search the apartment. Faced with this apparent Hobson's choice, Ms. Johnson agreed.

Officer Foster produced a blank consent form and filled out the information. Officer Foster read the form to Ms. Johnson and she signed it. The time on the form was 7:50 p.m., approximately twenty minutes after defendant's arrest. The agents listed all of the items that were taken from the apartment on the consent form. At the request of Agent Jones, Ms. Johnson made a written statement that the guns and drugs were not hers, but that the money belonged to her.

## ANALYSIS

Because a warrantless search or seizure is *per se* unreasonable, the Government must establish that its conduct falls within a recognized exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Anthon*, 648 F.2d 669, 675 (10th Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982). The primary issues are: (1) whether defendant was illegally detained on January 20, 1992, so that the search of the rental car was the fruit of an illegal detention; (2) whether either defendant or Ms. Ericka Johnson voluntarily consented to the January 29, 1992, search of the apartment; and (3) whether the statements made by defendant after his arrest were voluntary.

THE JANUARY 20, 1992 DETENTION AND SEARCH OF THE RENTAL CAR

■ Defendant argues that there was no reasonable suspicion to detain defendant, as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I disagree. Officer Allen observed that defendant was driving, that he had cut across the path of a vehicle proceeding in the opposite direction, and that he failed to signal for a turn. Clearly there was rea-

sonable suspicion which could justify further investigation, since Officer Allen had observed defendant violate one or more traffic ordinances.

■ Defendant seems to suggest that the traffic stop was a pretext for the later automobile search. The standard for determining whether the stop was pretextual is whether a reasonable officer would have made the stop. *United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir.1988). It is reasonable, and quite common, for police officers to stop traffic violators. There simply is no evidence that the stop itself was pretextual.

■ Defendant next argues that, even if there were no impropriety in the traffic investigation, Officer Allen had no reasonable basis to pull his gun and request that defendant place his hands on the car. Again, I disagree. Under *Terry v. Ohio* and its progeny, an officer may detain an individual and conduct a pat-down search for weapons if there is a reasonable belief that the individual poses a safety threat. *United States v. Santillanes*, 848 F.2d 1103, 1108 (10th Cir.1988). Defendant got out of his car and started walking towards the bar, ignoring Officer Allen's repeated warning to stop. After the officer intercepted him, defendant turned away toward the wall (out of the officer's view) and appeared to stuff something in his pants. Officer Allen recognized defendant and, based on their prior contacts, suspected that he might be armed. It was 2:00 a.m., and Officer Allen was alone in a neighborhood where there had been previous shootings and disturbances. In these circumstances, Officer Allen acted reasonably to protect himself, drawing his weapon and ordering defendant to place his hands on the car, so that the officer could retain control of the situation. This is in stark contrast to the case cited by defendant, *United States v. Santillanes*, 848 F.2d 1103 (10th Cir.1988), where the suspect had passed through airport security devices and there was absolutely no evidence that he posed a threat to the detective's safety or the safety of others.

It was during the time when defendant was detained with his hands on the car that Officer Allen noticed defendant passing a key to Leroy Crowley. That key was later used to open the rental car. Because I conclude that the detention did not violate the Fourth Amendment, there is no basis for finding that the key discovered during the course of the detention "tainted" the later automobile search.

■ Although the search of the rental car was accomplished without a warrant in circumstances where the grounds to search might reasonably be questioned, defendant evidently concedes that he is in no position to raise these additional issues if his initial detention is regarded as legal. To prove a protectable Fourth Amendment privacy right, defendant must have a legitimate expectation of privacy in the rental car. In *United States v. Roper,* 918 F.2d 885, 887–88 (10th Cir.1990), the court held that the defendant, who was driving a car rented by another party, did not have a reasonable expectation of privacy in the rental car. *Accord United States v. Obregon,* 748 F.2d 1371, 1375 (10th Cir.1984). Defendant did not rent the car himself, nor was he listed as an authorized driver. According to established Tenth Circuit precedent, defendant does not have a protected privacy right in the rental car. I therefore conclude that the automobile search did not violate defendant's Fourth Amendment rights. In view of this holding, I need not reach the Government's alternate bases for upholding the automobile search.

Defendant argues that Fourth Amendment violations which occurred on January 20, 1992, tainted the information on which the arrest warrant was issued. While there may be several responses to this argument, it is sufficient to state that, because defendant's Fourth Amendment rights were not violated during the events of January 20, 1992, there is no "taint" which would invalidate defendant's later arrest warrant. I therefore conclude that the arrest warrant was valid.

THE JANUARY 29, 1992 SEARCH OF THE APARTMENT

Because the January 29, 1992, search of the apartment was conducted without a warrant, the Government must demonstrate a recognized exception to the warrant requirement. *United States v. Anthon,* 648 F.2d 669, 675 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982). In discharging this burden here, the Government must first establish that the agents lawfully entered the apartment after defendant was grabbed and dragged outside the apartment. The Government justifies this initial entry as part of a "protective sweep" to secure the area, while defendant claims that this entry exceeded the scope of the protective sweep permitted by *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990). In either event, no evidence was seized during this initial "protective sweep."

Even if the initial entry is treated as a protective sweep, however, the Government must then find a basis for upholding the extensive search which was undertaken after the "protective sweep" was complete. The Government justifies this search by arguing that consent to search the apartment was given by both defendant and Ms. Ericka Johnson. I conclude that there was no effective consent. In light of this conclusion, I will simply assume, without passing on this troublesome issue, that the initial entry and protective sweep were proper.

■ A warrant is not required if the search is consensual. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The Government has the burden of proving that consent was given freely and voluntarily. *Id.,* 412 U.S. at 222, 93 S.Ct. at 2045. Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances. *Id.,* 412 U.S. at 227, 93 S.Ct. at 2047–48. There are three requirements to sustain a finding of voluntary consent: (1) there must be clear testimony that consent was unequivocal, specific, and freely and intelligently given; (2) the Government must prove consent was given without duress or coercion, express or implied; and (3) there must be convincing evidence of con-

sent—with every reasonable presumption made against the waiver of this fundamental constitutional right. *United States v. Werking*, 915 F.2d 1404, 1409–10 (10th Cir. 1990).

The Government first argues that defendant consented to the search. The record, however, is devoid of clear testimony or convincing evidence that defendant unequivocally consented or that any consent could be regarded as voluntary and specific. Nobody testified that defendant was squarely asked whether he would consent to a search of the apartment. Defendant simply responded to questions concerning the existence of guns or drugs in the apartment. Defendant made these statements while he was lying face-down in handcuffs, surrounded by armed officers and agents.

The Government points out that it was defendant who suggested, after he was brought inside the apartment, that his girlfriend Ericka should show the agents where the guns were. There is, however, no evidence that this act or other acts which the Government cites as manifestations of defendant's consent occurred *prior* to the actual search. The officers and agents clearly obtained Ms. Johnson's alleged consent *before* defendant was brought inside the house and made the statements that Ms. Johnson should show the agents where the guns were. (It should be recalled that Agent Bennett asked for Ms. Johnson's consent to search immediately after the agents entered the apartment.) After the agents obtained Ms. Johnson's consent, they began to search. Defendant's statements were thus made while a search without his permission was in progress and do not indicate his consent to search. I do not believe Officer Foster's testimony that defendant volunteered for the agents to "go ahead and look for the weapons." Agent Woods testified that he was listening to this conversation between defendant, Officer Foster and Agent Miller. Agent Woods testified that he did not hear anything else but the two questions concerning drugs and weapons and the discussion about whether defendant's girl-

friend should show the agents where the weapons were located. In any event, Officer Foster was unclear as to exactly when the statement was made. Taking into account all of these facts and circumstances, I find that the Government has failed to meet its burden of proving that defendant voluntarily consented to the search of the apartment.

The Government also relies on Ms. Ericka Johnson's consent. As the Government properly conceded in closing argument, the written consent is of no weight, since it was obtained after the search. The Government relies primarily on Ms. Johnson's statements and actions immediately after defendant's arrest. As Agent Jones was forcefully escorting her by the elbow into the kitchen, Ms. Johnson responded to Agent Bennett's question by indicating that she did not mind if the agents searched the apartment. The Government argues that Ms. Johnson's affirmative response to the question "do you mind if we search" is convincing evidence that consent was voluntary, citing *United States v. DeWitt*, 946 F.2d 1497 (10th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). Reliance on *DeWitt* is inappropriate here, since the Tenth Circuit simply held, in circumstances otherwise dissimilar to those before me, that such a statement supported the trial court's finding of voluntariness. Voluntariness must still be determined under all of the facts and circumstances of the case; therefore, this one statement does not conclusively prove voluntary consent.

The Government's argument concerning Ericka Johnson's consent relies heavily upon its version of the facts, which I regard as hopelessly confused and contradictory. The Government claims that Ms. Johnson went upstairs with Agent Miller, pointed silently to the closet, and motioned mutely underneath the bed. As I have already indicated, the testimony supporting this claim is sketchy, contradictory, and implausible. Of the five agents and officers that were at the apartment during the arrest, only Agent Miller testified that Ms. Johnson went upstairs and pointed out the

locations of the briefcases. Agent Downs and Agent Woods both testified that they did not see Ms. Johnson go upstairs during the search. Agent Jones directly contradicted herself. First, she stated that she was downstairs with Ms. Johnson the entire time; later (in re-direct examination) she testified that Ms. Johnson did go upstairs with other agents.

Equally troubling is the lack of evidence concerning certain questions. There is no testimony as to where Ms. Johnson went after she pointed to the briefcases. Did these agents, who obviously knew she was defendant's girlfriend, allow her to wander the apartment by herself? There is also no testimony as to where her four-year-old son was during this time. Agent Jones never testified that Ms. Johnson's son was left in her custody while Ms. Johnson went upstairs. Surely a small child was not allowed to wander about unsupervised.

As indicated earlier, I cannot find that Ms. Johnson actually went upstairs. Without this fact, I cannot find that the Government has sustained its burden of proving that Ms. Johnson understood the scope and purpose of the search. This case is quite different from the automobile search cases cited by the Government. When a person agrees to a search of his or her car, he or she is implicitly agreeing to a search of the very limited space inside. In most cases, the person is watching the search and may object if the search gets out of control. *Cf. DeWitt,* 946 F.2d at 1497. If a person agrees to a search of his or her apartment, there is no similar implicit agreement as to the scope of the search. May the officers look in the ceilings and walls and under the floorboards? In bottles and pill containers? Consent must be specific. *United States v. Werking,* 915 F.2d 1404, 1409 (10th Cir.1990). At the very least, the person consenting must know the purpose of the search. The agents and officers did not ask Ms. Johnson if they could search for anything specific, such as weapons or drugs. Agent Bennett merely asked, generally, if they could search the apartment. True, there is testimony that Ms. Johnson, defendant, and the agents discussed where weapons were located in the apartment.

This conversation, however, does not establish that Ms. Johnson thereby consented to a search for weapons. Moreover, there is absolutely no evidence that this conversation occurred before the agents initiated the search.

Other circumstances further support the conclusion that Ms. Johnson's consent was not voluntary. Ms. Johnson was asked to consent to the search immediately after her boyfriend was forcibly arrested and was lying face-down outside the apartment, while there were at least five armed agents and officers in or near her apartment, while her four-year-old child was standing beside her, and while they were being escorted to the kitchen by an armed agent. Nobody made it clear to her that she could withhold consent. Given these circumstances, I conclude that the Government has failed to meet its burden of proving that Ms. Johnson's consent was given freely and intelligently. To the contrary, the circumstances under which the alleged consent was given support a finding of implicit duress and coercion.

DEFENDANT'S POST–ARREST STATEMENTS

■ Defendant argues that he was not advised of his *Miranda* rights (or, if so advised, that he did not voluntarily waive those rights) and that any statements made were not voluntary. Prior to conducting an in-custody interrogation, law enforcement officers must advise defendant of his Fifth and Sixth Amendment rights: that he has the right to remain silent, that anything he says may be used against him, and that he has a right to have an attorney, either retained or appointed, present during interrogation. *Miranda v. State of Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Statements made in response to custodial interrogation are inadmissable as evidence of guilt unless defendant is informed of these rights. *Cordoba v. Hanrahan,* 910 F.2d 691 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990); *Berkemer v. McCarty,* 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984).

■ I must deal with two threshold issues: (1) Does the Government bear the burden of proving that *Miranda* warnings were given? and (2) If it does bear that burden, has it discharged the burden here? With respect to the first question, I find the controlling precedent to be somewhat unclear. It appears in this circuit that defendant bears the initial burden of pointing to some evidence challenging the legality of his confession or statements. Once defendant has pointed to some evidence that his statements were made in violation of his constitutional rights, the Government bears the burden of proving that defendant voluntarily waived his constitutional privilege against self incrimination and his constitutional right to counsel. *See United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir.1975).

Placing on the Government the ultimate burden of proving voluntary waiver is appropriate, for several reasons. First, it is the trained government agents, not the frequently-unsophisticated or ignorant suspects, who should be in the best position to observe and recall exactly what warnings were given and other circumstances relevant to the issue of voluntariness. Second, since a voluntary waiver of a fundamental constitutional right should not be presumed, and since defendant should not have the burden of proving a negative proposition, the Government should bear the burden of proof. Third, the burden is not a difficult one to discharge, if the officers have followed *Miranda* and otherwise performed their duties.

■ Here, I find enough evidence to satisfy defendant's burden of pointing to evidence supporting his position and to require that the Government bear the ultimate burden of proof. Agent Miller and Officer Foster began questioning defendant immediately after he had been forcibly arrested by several armed agents. There is no doubt that defendant was in custody when he was interrogated by Officer Foster and Agent Miller. Defendant did not remain silent or request an attorney. This evidence is sufficient to raise the question of whether defendant's responses were obtained in violation of his Fifth and Sixth Amendment rights. The Government must therefore prove that defendant voluntarily waived his Fifth and Sixth Amendment rights. *Crocker*, 510 F.2d at 1135.

■ As mentioned, the second threshold issue is whether the Government has discharged its burden to prove that defendant voluntarily waived his rights. The Supreme Court has articulated two components of a voluntary waiver. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). The first question is whether the officers fully advised defendant of his constitutional rights. *See Miranda*, 384 U.S. at 467–68, 86 S.Ct. at 1624. Officer Foster testified that he "advised Mr. Gilmer of his *Miranda* rights." Officer Foster did not explain his understanding of the *Miranda* rights, nor did he recite the *Miranda* advisement that was given to defendant. Agent Woods testified that Officer Foster "*mirandized*" defendant, but again, he did not testify as to what was actually said. Agent Miller also testified that he witnessed Officer Foster "*mirandize*" defendant. When asked what Officer Foster said to defendant, Agent Miller attempted to repeat what was said, but could not remember.

■ General, conclusory statements such as those recited above are not sufficient to discharge the Government's burden of proving that *Miranda* warnings were given. Whether a sufficient *Miranda* warning was given or whether a suspect was "*mirandized*" is a question which the court must decide, based on all the testimony. The result may well vary, depending upon the exact testimony given, and only with specific testimony can the court decide whether the officers conveyed *all* of the proper warnings and whether the state-

ment in question was admissible. *See generally United States v. Anthon,* 648 F.2d at 672–74 (holding inadmissible a statement made after incomplete *Miranda* advisement, but holding a subsequent statement admissible because the court found it was given after a full advisement). *Cf. id.,* 648 F.2d at 678 (Seymour, J., dissenting) (arguing that not even the subsequent advisement was adequate). The Government and its agents may not, by giving conclusory testimony, arrogate to themselves the decision as to whether adequate *Miranda* warnings were given.

 The situation presented here illustrates the soundness of a rule requiring specific testimony. There is simply no evidence that Officer Foster knew what warnings are required under *Miranda* or that he properly advised defendant of all of his *Miranda* rights on this occasion. Agent Miller was unable to recall what was said or to supply the *Miranda* warnings. I cannot fill the gaps created by the testimony. I find no authority that the Government is entitled to the presumption that the *Miranda* advisement was adequate under these circumstances. To the contrary, *Miranda* implies that the burden must be placed on the government. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628.

The purpose of the *Miranda* warnings is to make defendant aware of his Fifth and Sixth Amendment rights and the consequences of waiving those rights. "Failure to administer *Miranda* warnings creates a presumption of compulsion." *Oregon v. Elstad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985). For reasons stated above, the Government has failed to meet its burden of proving that defendant was fully aware of his constitutional rights and the consequences of waiver. I therefore conclude that the Government has failed to meet its burden of proving that defendant's waiver was voluntary.

 I also find other factors indicating that defendant's waiver was not voluntary. In determining whether a waiver was voluntary, the court looks at the totality of the circumstances. *Moran,* 475 U.S. at 421, 106 S.Ct. at 1141. Defendant was thrown to the ground, handcuffed, and was lying face-down. He was surrounded by two armed agents and one armed officer. In addition, two armed agents had entered his apartment. The agents had taken control of defendant and his apartment. Defendant was then interrogated by one agent and an officer—both armed. These circumstances demonstrate a very coercive environment. Defendant's statements do not reflect a conscious decision to speak, but rather appear to be reflexive responses to the interrogation.

Because I find that the Government has failed to meet its burden of proving that defendant's waiver was voluntary, I do not reach the separate, but related, issue of whether the statements themselves were made voluntarily. Although defendant implies that later statements were made in violation of his constitutional rights, there is no evidence of what those statements were or the surrounding circumstances. Accordingly, I do not decide the admissability of any other statements besides those made at 4900 East 33rd Avenue after defendant's arrest.

Upon the foregoing findings and conclusions, it is therefore

ORDERED as follows:

1. Defendant's motion to suppress evidence taken from the rental car on January 20, 1992, is denied.

2. Defendant's motion to suppress evidence taken from the apartment at 4900 East 33rd Street on January 29, 1992, is granted.

3. Defendant's motion to suppress defendant's statements made at 4900 East 33rd Street is granted.