[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1065 
Christopher Lee Price was convicted of capital murder for the intentional murder of Bill Lynn during the course of a robbery in the first degree. After a sentencing hearing, the jury returned an advisory verdict recommending, by a vote of 10 to 2, that Price be sentenced to death by electrocution. After holding a separate sentencing hearing, the trial court sentenced Price to death by electrocution. Price was also convicted of robbery in the first degree for the robbery of Bessie Lynn, Bill Lynn's wife, and the trial court sentenced him to life imprisonment, without parole, for that conviction. The Court of Criminal Appeals affirmed Price's convictions and sentences. Price v. State, 725 So.2d 1003 (Ala.Cr.App. 1997). This Court granted Price's petition for certiorari review pursuant to Rule 39 (c), Ala. R. App. P. We affirm.
 Facts
Through the testimony of Bessie Lynn and the admission of a statement Price had given to authorities in Chattanooga, Tennessee, approximately one week after the alleged offenses, the State presented evidence tending to show the following:
 "On the evening of December 22, 1991, Bill and Bessie Lynn returned to their home following a church service at the Natural Springs Church of Christ, where Bill Lynn had served as minister. The victims' home was located in the Bazemore community of North Fayette County. Bill Lynn had begun assembling Christmas toys for his grandchildren, while Bessie Lynn had dressed for bed and was upstairs in her bedroom watching television. The electricity suddenly failed and, because the security lights outside remained on, and because the electricity was still on in a neighbor's home, Bill Lynn told his wife to call the power company to report the outage. He then walked outside to check the power box. Bessie Lynn heard a noise outside and, upon looking out of her window, saw an individual in what she called a `karate stance,' holding what appeared to be a sword in his right hand, high above his head in a striking position. Bessie Lynn testified that the individual was dressed completely in black. Bill Lynn yelled for his wife to telephone the police, and, upon discovering that the telephone lines had been cut, she hurried downstairs, where she picked up a candle and armed herself with a pistol that the Lynns kept in a kitchen drawer by a bank deposit bag. The bank deposit bag contained cash and checks received from an automobile parts business operated by Bill Lynn. Bessie Lynn testified that she then hurried outside and that when she did someone struck her and knocked her to the ground. She testified that she got up and fired a gunshot into the air and began calling for her husband. She found him in the yard and tried to give him the gun, telling him to shoot the people, but Bill Lynn, who had been severely wounded, told her there were no bullets left in the gun. She then told her husband that she was going for help; he told her to give the culprits anything that they wanted. Bill Lynn had told his wife at that point that he knew he was going to die. Bessie Lynn, who was in their van and attempting to insert the key into the ignition, became aware of two men, one on each side of the van. They ordered her out of the van, and when she *Page 1066 
 got out she was beaten with an object. One of the individuals were demanding money. They ordered her back into the house, where the two individuals, both dressed in black, demanded her money and jewelry. They took a rifle and shotgun from the house, the pistol that Bill Lynn still had, and the checks and cash from the bank deposit bag. They also ordered Bessie Lynn to give them her jewelry. She responded that she did not wear jewelry other than her two rings and asked if she might keep her wedding ring. She was instructed to take her rings off and to drop them in a bad, which they took. The culprits instructed Mrs. Lynn to remain where she was and they searched for something in the kitchen and then outside the house. Bessie Lynn testified that when the two men came back in the house, a vehicle apparently drove by the house. The two men then went out the back door, and Bessie Lynn testified that she then ran out the front door. She ran back to her husband to tell him that she was going for help. He asked her to hurry, and she ran to her father's house, which was located nearby. From her father's house she telephoned for help. Bill Lynn died before he reached the hospital. Bessie Lynn was treated for wounds to her head, her hands, her chest, and her thighs.
 "Several days later, [Price] was arrested in Chattanooga, Tennessee, where he had been visiting friends. He gave a statement to the authorities in Tennessee, admitting his participation in the offensed, but claiming that his accomplice had actually killed Bill Lynn and wounded Bessie Lynn. He subsequently gave another statement to Alabama authorities."
Price v. State, 725 So.2d at 1011-1012.
 I.
Before the Court, Price raises 23 issues, all of which were considered and rejected by the Court of Criminal Appeals. Although we have carefully reviewed and considered all of Price's arguments, we will address only one issue in this opinion: whether the trial court erred when it denied Price's motion to suppress any extrajudicial inculpatory statements Price gave to law enforcement authorities.
 II.
Before trial, Price gave two statements to law enforcement authorities. He gave the first statement to Detective Michael Mathis of the Chattanooga, Tennessee, Police Department on December 29, 1991 (the "Tennessee statement"). The record indicates that Detective Mathis made audiotapes of that interview and later provided in the audiotapes to Sheriff James Turner in Fayette County, Alabama. Sheriff Turner testified that his secretary prepared a typed transcript of the tapes of Detective Mathis's interview.[1]
Price have the second statement to Sheriff Turner on December 29, 1991, in Fayette County (the "Alabama statement"). Sheriff Turner testified that his interview was also recorded on audiotape and that a typed transcript was prepared.[2]
Price filed a pretrial motion to suppress, requesting that the trial court suppress "[a]ny statements made by [Price], whether oral, written or videotaped, which the State intends to introduce into evidence or otherwise use at the trial of this case." Price did not specify in the motion why the statements should be suppressed. The trial court conducted a hearing on Price's motion on December 15, 1992, during which the State presented evidence regarding both statements. At the hearing, the trial judge denied Price's motion to suppress, as to both statements.
On appeal, Price contends that both statements should have been suppressed because, he says: (1) with regard to both of the statements, the State failed to adequately demonstrate that the law enforcement authorities had properly advised him of his Miranda rights (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 *Page 1067 
(1966)) before questioning him; and (2) the Tennessee statement was the product of an improper inducement.
 III.
It is well established that extrajudicial confessions and other inculpatory statements are prima facie involuntary and that for such a statement or confession to be admissible the State must prove by a preponderance of the evidence that it was voluntary.Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). To satisfy this burden, the State must show: (1) that proper Miranda
warnings were given before any questioning by the police and (2) that the statement was voluntary, i.e., that it was not procured through coercion or improper inducement. See Stariks v. State,572 So.2d 1301, 1304 (Ala.Crim.App. 1990); McLeod v. State,718 So.2d 727, 729 (Ala. 1998). The initial determination of admissibility is made by the trial court, and the trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. McLeod, supra; Stariks, supra.
 IV.
Price argues that, with regard to both statements, the State failed to demonstrate that he was properly advised of his Miranda
rights before being questioned. Although there is no talismanic incantation required to satisfy the requirements of Miranda, it is well settled that, before being questioned, an accused in custody must be informed in clear and unequivocal terms that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to have counsel present at the interrogation, and that if he is indigent and cannot afford to pay a lawyer, the court will appoint one to represent him during the interrogation. See Ex parte Siebert,555 So.2d 780, 781-82 (Ala. 1989), citing, California v. Prysock,453 U.S. 35a, 359-60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); Wallacev. State, 290 Ala. 201, 275 So.2d 634 (1973). If the defendant is not advised of each of these rights before being questioned, then any statement he makes during the questioning is not admissible against him as evidence of guilt. See, e.g., Berkemer v. McCarty,468 U.S. 420, 429, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (statements made in response to custodial interrogation are inadmissible as evidence of guilt unless the defendant was advised of the rights established in Miranda).
 V.
We will first consider whether the State demonstrated that Price had been properly advised of his Miranda rights before being questioned by Detective Mathis in Chattanooga.
Price argues that this Court may consider only the evidence that was before the trial court when it denied the motion to suppress and, therefore, that it may not consider any additional evidence relevant to this issue that was produced subsequently at trial. He contends that the State did not actually produce evidence at the suppression hearing that precisely identified which rights were explained to him before he provided the Tennessee statement; therefore, he argues, the State failed to show that he was properly advised of his Miranda rights. However, Price has cited no legal authority or persuasive reason in support of a rule requiring this Court to consider only the evidence presented to the trial court at the pretrial suppression hearing. Accordingly, we will apply the long-standing rule that, in considering whether the trial court properly overruled a defendant's motion to suppress an extrajudicial confession or other inculpatory statement, a reviewing court may consider both the evidence presented at the pretrial suppression hearing and the evidence presented at trial. See, e.g., Henry v. State,468 So.2d 896, 899 (Ala.Crim.App. 1984); United States v. Smith,527 F.2d 692, 694 (10th Cir. 1975) ("In passing on the correctness of the trial court's denial of [the defendant's] motion to suppress, we are not limited to a consideration of just the evidence introduced at the hearing on the motion to suppress. In addition thereto, we may also consider the evidence adduced at trial, even though such may *Page 1068 
not have been presented at the pretrial suppression hearing.").[3]
Before he attempted to introduce the Tennessee statement into evidence at trial, the prosecutor questioned Detective Mathis. Detective Mathis testified that before he questioned Price, he informed Price of his constitutional rights and that he used the "standard rights form" required by the Chattanooga Police Department. He testified that he explained every portion of that form to Price and, before continuing, ascertained whether Price understood what was being read to him. Detective Mathis was then asked to describe specifically what he had told Price; he stated that Price was told:
 "[B]efore we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questions if you wish. If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time. You also have the right to stop answering questions at any time until you talk to a lawyer."
This statement complied with both Alabama and Federal law regarding the obligation to inform an accused in custody of his rights under Miranda. See Wallace, supra. Accordingly, after reviewing the complete record on this issue, we conclude that the State demonstrated that Price was properly advised of his Miranda
rights before being questioned by law enforcement authorities in Chattanooga, Tennessee.
 VI.
We will next address Price's argument that the State failed to prove that he was properly advised of his Miranda rights before he gave the Alabama statement to Sheriff Turner in Fayette County.[4] At the outset, we note that the record indicates that the State did not seek to introduce this statement into evidence at trial; indeed, it appears from the record that neither the audiotape of the statement nor the typed transcript of that tape was ever considered directly by either the trial court or the jury. At first blush, therefore, it appears that Price was not prejudiced by an error in regard to this issue.
However, the record does reflect that Sheriff Turner testified at trial that he had interviewed Price and that, during the interview, they had discussed the location of a .44 caliber pistol and a holster. Specifically, Sheriff Turner testified that Price gave him directions explaining how the police could locate these pieces of evidence. The State also presented evidence indicating that these two items had belonged to Bill Lynn. In short, the State introduced evidence tending to show that Price had provided a statement to Sheriff Turner and that his statement contained information concerning the location of items that had belonged to the victim. There can not be no doubt that, by linking Price to the crime, this reference to the Alabama statement was inculpatory to some extent and contributed in at least some measure to Price's conviction. Accordingly, if the State failed to prove that Price had been properly advised of hisMiranda rights before Sheriff Turner interviewed him, the State should not have been permitted to introduce evidence of *Page 1069 
that statement. See, e.g., Berkemer, supra.[5]
The facts relevant to whether Price was fully informed of hisMiranda rights before being questioned by Sheriff Turner are as follows: At the pretrial suppression hearing, Sheriff Turner was asked whether he had advised Price of his "constitutional right to counsel and to not give a statement and the other rights commonly referred to as Miranda rights." Sheriff Turner responded by saying that Price had been advised "of his rights" and that the audiotapes of the interview reflected that fact. However, the record of the suppression hearing does not show that the trial judge reviewed either the audiotapes or the typed transcript of Price's statement to Sheriff Turner before ruling on whether that statement should be suppressed; nor does the record show that Sheriff Turner read the typed transcript aloud at the suppression hearing.
During her cross-examination of Sheriff Turner at the suppression hearing, Price's counsel asked Sheriff Turner whether Price had been given the Miranda warnings "from a form." Specifically, the record contains the following colloquy:
 "[Defense counsel:] Sheriff Turner, did you Mirandize [sic] [Price] from a form?
 "[Sheriff Turner:] He was read his rights and advised that he could not talk to us until he obtained an attorney, that he also could stop answering questions at any time or make [sic] any statements until he talked to an attorney, at which time he understood these rights.
 "[Defense counsel:] My point is did you Mirandize him from a form?
"[Sheriff Turner:] Yes, ma'am.
"[Defense counsel:] You got it in your files?
"[Prosecutor:] I don't know.
 "[Defense counsel:] Is that standard procedure in your office that there is a —
 "[Sheriff Turner:] No, ma'am, not necessarily on signing off, but do Mirandize them [sic].
"[Prosecutor:] Did I furnish you such a form?
 "[Defense counsel:] I don't think with this statement, no. I think with the other statement.
 "[Prosecutor:] If I didn't furnish that, I didn't have it then.
 "[Defense counsel:] You were present, then, when Deputy Strickland Mirandized him from a form or a card?
"[Sheriff Turner:] Yes, ma'am."
After hearing further testimony regarding the voluntariness of the Alabama statement,[6] the trial judge denied Price's motion to suppress that statement.
During the State's case-in-chief, the prosecutor questioned Sheriff Turner concerning his role in the investigation of Bill Lynn's murder and, as described above, specifically asked Sheriff Turner if he had interviewed Price. Sheriff Turner answered that he had interviewed Price. The prosecutor then asked Sheriff Turner:
 "Prior to talking to [Price], did you advise him of his right to have an attorney if he wanted to, to not make a statement if he did not want to, to stop making a statement at any time and consult an attorney and that if [sic] any statement he did make could be used against him in court? Did you do that?" *Page 1070 
Sheriff Turner answered that a deputy had advised Price of his rights and that the statement of his rights had included all of what the prosecutor had asked about in his question; he did not testify that the statement of his rights contained any information not included in the prosecutor's question.
The record indicates that the evidence set out above is the only evidence presented that was relevant to the question whether Price was advised of his Miranda rights before being questioned by Sheriff Turner. Although Sheriff Turner testified at the pretrial suppression hearing that the Alabama statement had been audiotaped and that the tape reflected that Price had been informed of his rights, there is no indication in the record that either the audiotape or the typed transcript of the statement was introduced as evidence during the trial. We further note that, on cross-examination, Price's trial counsel did not ask Sheriff Turner any questions concerning what warnings the deputy actually gave Price. Her questions were limited to whether the warnings were given "from a form," and she did not ask what was printed on the form.
The testimony set out above does not contain a complete statement of the rights provided by Miranda v. Arizona. For example, in his question to Sheriff Turner, the prosecutor did not ask him if Price had been advised that, if he could not afford an attorney, one would be appointed for him. See Mirandav. Arizona, 384 U.S. 436, 473, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966) ("[i]n order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with any attorney, but also that if he is indigent a lawyer will be appointed to represent him"). Wallace, supra. Also, it is clear that, although Sheriff Turner presented testimony indicating that Price's rights were read to him from a preprinted card or form, Sheriff Turner did not read that card at trial. Cf. Carr v.State, 640 So.2d 1064, 1070 (Ala.Crim.App. 1994) (holding that the State demonstrated that the defendant had been fully informed of his Miranda rights, because a law enforcement officer testified at trial that he had orally informed the defendant of his Miranda rights by reading those rights from a preprinted cardand read that card at trial). Furthermore, the testimony set out above provides no evidence that Price actually signed a waiver-of-rights form before being interviewed. In short, the State never articulated precisely which rights were explained to Price before he was questioned by Sheriff Turner. The question presented, therefore, is whether the State satisfied its burden of proving that Price was properly advised of his rights before he was questioned in Fayette County, when it presented Sheriff Turner's testimony that Price had been read his Miranda rights from a form or card, without specifying the contents of that form or card.
Courts, attorneys, law enforcement officers, and the public frequently use the word "Mirandize" or a simple reference to theMiranda decision as a type of shorthand summary of all of the rights articulated in Miranda v. Arizona. See, e.g., Commonwealthv. Crowley, 160 Pa. Cmwlth. 324, 634 A.2d 826, 828 n. 5. (Pa.Commw. Ct. 1993) (explaining that "[t]he term `Mirandized-by-T.V.' reflects the concept that, due to the popularity of television police shows and the exposure of the public to Miranda warnings on television and in the movies, people now have a general familiarity with their constitutional rights when accused of a crime"); State v. Ralston, [No. CA-957, May 11, 1983, n. 1] (Ohio Ct. App. 1983) (unpublished opinion) ("[w]hile `Mirandize' is not a verb, yet, it succinctly describes the procedural warning required by Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694"). Indeed, it is not uncommon for appellate courts to assert that a given statement is admissible because the defendant was advised of his Miranda
rights, without articulating in the opinion itself the precise rights that were explained to the defendant. See, e.g., Hold v.State, 485 So.2d 801 (Ala.Crim.App. 1986) (the defendant made his statement to the sheriff after he had been advised of hisMiranda rights and had stated that he understood those rights; thus, the statement was admissible in the defendant's murder trial). *Page 1071 
However, the fact that knowledge concerning the rights established in Miranda has become widespread does not necessarily establish that a court may conclude that law enforcement authorities properly advised a suspect of his rights simply because an officer testifies that the suspect was advised of his"Miranda rights" from a form. In Ex parte Johnson, 620 So.2d 709,711 (Ala. 1993), this Court explained that in order to satisfy its burden of proving that a defendant was informed of hisMiranda rights, the State must spell out with clarity and precision the specific Miranda warnings the police gave to the defendant, because "the general question of whether the Miranda
warnings were given does not adequately establish whether the warnings were properly given and understood by the defendant." (Emphasis in original.) See also, Moll v. United States,413 F.2d 1233, 1238 (5th Cir. 1969) ("[t]he government's burden [of proving that proper Miranda warnings were given] may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading Miranda warnings or that what is read, without revelation of its contents, meets constitutional standards").
The record in this case does not indicate precisely which rights were explained to Price. In the absence of any evidence indicating the contents of the form that was read to Price or explaining Sheriff Turner's understanding of what rights must be explained to a suspect, we are forced to conclude that there was no evidence from which the court could have properly concluded that Price was advised of each of the rights established inMiranda before he provided his statement to Sheriff Turner. For example, when Sheriff Turner elaborated at trial on the rights mentioned to Price, he did not articulate all of the rights provided for in Miranda, in particular, his testimony omits any indication that Price was advised that he had the right to have a lawyer appointed if he could not afford one. A court cannot fill in an evidentiary gap with supposition or a presumption concerning a witness's knowledge. In short, this Court cannot presume that Price was advised of all of his rights, based solely on testimony that Price was "Mirandized" from a form; therefore, the State failed to demonstrate that Price had been informed of his Miranda rights before being questioned by Sheriff Turner. Cf.United States v. Gilmer, 793 F. Supp. 1545, 1554-56 (D. Colo. 1992) (holding that general, conclusory testimony from police officer that he had "advised [the defendant] of his Miranda
rights," at 1555, without an explanation of the officer's understanding of the Miranda rights or of the exact statement of rights that was given to the defendant was insufficient to satisfy the burden of proving that proper Miranda warnings were given, and stating that "[t]he Government and its agents may not, by giving conclusory testimony, arrogate to themselves the decision as to whether adequate Miranda warnings were given," at 1556); People v. Parquette, 123 Ill. App.3d 233, 237-38, 78 Ill.Dec. 582, 462 N.E.2d 701, 705 (1984) (stating that officers' conclusory testimony that they had given the defendant his"Miranda warnings," which testimony did not specify the words actually employed to convey those warnings, was insufficient to show that the defendant had received adequate Miranda warnings);In re M., 70 Cal.2d 444, 461-62, 75 Cal.Rptr. 1, 450 P.2d 296,306-07 (1969) (a police officer's conclusory testimony that he gave the defendant advice "per accordance with the Miranda Decision" is inadequate to show that the defendant received full and complete Miranda warnings).
We note that the record shows that, although Price filed a general pretrial motion to suppress any statement he had made to law enforcement authorities, Price's trial counsel did not object when the State asked Sheriff Turner whether he had interviewed Price. However, because Price was convicted of capital murder, this Court will review the record for plain error and, if it finds such error, correct it by "appropriate appellate action." See Rule 39 (k), Ala. R. App. P.
Therefore, having determined that the trial court erred in permitting the State to admit evidence of Price's statement to Sheriff Turner, we must determine whether this error was so egregious as to amount to plain error and thus require a reversal of Price's conviction for capital murder. In *Page 1072 
order to constitute "plain error," the error must be a particularly egregious one that seriously affects the fairness, integrity or public reputation of judicial proceedings. See, e.g., Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Crim.App. 1990), and cases cited therein. In addition, the claimed error must have had an unfair prejudicial impact on the jury's deliberation. Id.
Our examination of the record in this case leads us to conclude that the admission of the evidence of Price's Alabama statement did not amount to plain error. As indicated above, the court did not admit into evidence the statement itself. Instead, the evidence at issue here consisted primarily of Sheriff Turner's testimony that he had interviewed Price and that, during the course of the interview, they had discussed the location of the .44 caliber pistol and the holster Price and his accomplice had taken from the victim's residence. There is no doubt that this evidence helped link Price to the crimes at issue. However, Price himself discussed these pieces of physical evidence with Detective Mathis in the Tennessee statement, which, as we discuss in Part VII, 725 So.2d at 1072, was properly admitted into evidence. Moreover, the additional evidence connecting Price to the crimes was overwhelming. In the Tennessee statement, Price directly implicated himself in the crimes and provided law enforcement authorities with the location of most of the physical evidence linking him to the crimes. Because the State produced overwhelming evidence, beyond Sheriff Turner's testimony concerning the Alabama statement, connecting Price to the crimes, we conclude that the error in allowing Sheriff Turner to testify regarding the statement did not rise to the level of plain error. Cf. Bush v. State, 523 So.2d 538, 557 (Ala.Crim.App. 1988) (holding that the erroneous admission of the defendant's first statement could not have contributed to the defendant's conviction because the first statement was merely cumulative of the evidence contained in the properly admitted second statement); Kinder v. State, 515 So.2d 55, 69 (Ala.Crim.App. 1986) (any error in the admission of the defendant's statement was rendered harmless when the defendant admitted to the same facts on the witness stand).[7]
 VII.
Price also argues that his statement to Tennessee authorities was not voluntary and should have been suppressed because, he claims, it was the product of an improper inducement; specifically, Price contends that the statement was procured through a promise of leniency. It is well established that a confession, or any involuntary statement, is involuntary if it is either *Page 1073 
coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532,18 S.Ct. 183, 42 L.Ed. 568 (1897). A court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make a confession. Ex parteGaddy, 698 So.2d 1150 (Ala. 1997). The test of involuntariness of a confession, or other inculpatory statement, is whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by the apprehension of harm or hope of favor. McLeod, supra, 718 So.2d at 729. To determine whether a defendant's will has been overborne, it is necessary to assess "`the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure' [and] `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures."' McLeod, 718 So.2d at 730 (quoting an earlier case).
During cross-examination at the suppression hearing, Price's trial counsel asked Detective Mathis whether he had told Price that if he gave a statement it would go easier on him. Detective Mathis answered that he had not told Price that. Price's trial counsel then asked Detective Mathis whether he had told Price that he would give a good report as to his cooperation, and Detective Mathis answered:
 "I very possibly could have said that I would be willing to say that he cooperated. That's something that I frequently will say that I do tell people. You know, if they cooperate, then I will be the first to say that, yes, they did."
Price contends that this testimony shows that the Tennessee statement was not voluntarily given.
We disagree. Looking at the totality of the circumstances in this case, we cannot conclude that Price's statement to Detective Mathis in Chattanooga was procured through an improper inducement. Detective Mathis testified he did not tell Price that it would be better for him to confess or to make a statement and that he did not offer him any kind of inducement to obtain the statement. Likewise, the evidence does not suggest that Price was threatened with physical intimidation or psychological pressure.
Price was 19 years old when he gave his statement to the police, and Detective Mathis testified that Price told him he was about to graduate from high school and that he could read and write. Detective Mathis further testified that Price signed a waiver-of-rights form, and the transcript of the statement shows on its face that Price was fully informed of his Miranda rights. In addition, the record indicates that Price had had at least some measure of experience with the judicial system as a juvenile.
The evidence shows that the Price was not held an inordinate length of time before being interviewed, and it shows that before and during the interview he was fed breakfast, was provided soft drinks, was permitted to smoke, and was permitted to use the rest room. Finally, we note that the interview lasted approximately one and a half hours and was therefore not inordinately long.
We conclude that the possibility that Detective Mathis might have told Price that he would make Price's cooperation known was insufficient, given the totality of the circumstances, to make Price's confession involuntary. Cf. Ex parte Gaddy, supra; McLeodv. State, supra. In addition, as indicated above, we conclude that the State demonstrated that Price was fully informed of hisMiranda rights before being questioned by Detective Mathis. Accordingly, we hold that the trial court properly denied Price's motion to suppress the Tennessee statement and properly admitted that statement into evidence at trial.
 VIII.
We have carefully considered the remainder of Price's arguments and have found no reversible error with regard to either of Price's convictions. Moreover, we have reviewed the record in this case in order to answer the three questions set forth in §13A-5-53 (b), Ala. Code 1975. We conclude that no passion, prejudice, or other arbitrary factor influenced the imposition of the death *Page 1074 
penalty. We further conclude that the record supports the trial court's finding of two aggravating circumstances — that the capital offense was especially heinous, atrocious, and cruel and that the capital offense was committed during the course of a robbery in the first degree. Although there was some mitigation, including Price's age and his limited prior involvement with the criminal justice system, our independent weighing of the aggravating circumstances and the mitigating circumstances does not indicate that the death sentence was inappropriate in this case. Finally, we note that the imposition of the death penalty in a case in which the defendant has been convicted of murder during the course of a robbery in the first degree and in which the evidence shows that the victim received over 30 wounds is not excessive or disproportionate to the penalty imposed in similar cases.
 Conclusion
The State failed to prove that Price had been adequately advised of his Miranda rights before he gave his statement to law enforcement authorities in Fayette County, Alabama; however, any error in this regard did not amount to reversible error. We note that our decision on the admissibility of the Alabama statement does not impact Price's noncapital conviction for robbery in the first degree based on the robbery of Bessie Lynn. As noted above, Price did not object at trial to the State's reference to the Alabama statement or to the admission of the physical evidence that was located in part because of that statement. Because Price's conviction for robbery in the first degree is not subject to the plain error rule, we do not review this issue with regard to that conviction. See Liberty Nat'l Life Ins. Co. v. Beasley,466 So.2d 935 (Ala. 1985).[8] Furthermore, the record shows that the State met its burden of proving that the Alabama statement was voluntary.[9] Finally, we conclude that the State demonstrated that Price had been advised of his Miranda rights before he was interviewed by Detective Mathis in Chattanooga and that the Tennessee statement was voluntary.
We have carefully reviewed the entire record and all of Price's arguments. Finding no reversible error, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOOPER, C.J., and HOUSTON, COOK, SEE, and LYONS, JJ., concur.
[1] Ultimately, the State read the typed transcript of the statement, in its entirety, into evidence at trial.
[2] Nothing in the record indicates that this statement was introduced into evidence at trial.
[3] Because we conclude that it is appropriate to review the evidence adduced at trial, we express no opinion as to whether the evidence produced at the pretrial suppression hearing demonstrated that Price was properly advised of his Miranda
rights.
[4] Price had not contended that his statement given to Sheriff Turner in Fayette County was procured through force, intimidation, or unducement; therefore, the only issue with regard to the Alabama statement is whether it was precered by an adequate Miranda warning.
We note that the record in this case shows that the State met its burden of proving that the Alabama statement was voluntary. Sheriff Turner testified that Price was not threatened or offered any inducement or reward for providing a statement. He further testified that Price was not told that it would be better for him to make a statement. In the absence of any evidence to the contrary, we note that this testimony was sufficient to show that Price's statement to law enforcement officials in Fayette County was voluntary.
[5] In light of the fact that the state introduced evidence of the statement itself, we do not address whether the trial court erred in admitting into evidence the physical items (i.e. the .44 caliber pistol and the holster that were apparently located in part as a result of that statement. Cf. United States v.Sangineo-Miranda, 859 F.2d 1501, 1518 (6th Cir. 1988) (holding, pursuant to Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285,84 L.Ed.2d 222 (1985) that cocaine found as a result of a Miranda
violation was admissible even though the statement itself was not admissible because "where police simply rail to administerMiranda warnings, the admissibility of nontestimonial physical evidence derived from the uncounselled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment"): Baker v. State, 555 So.2d 273 280 (Ala.Crim.App. 1989) (holding that clothing that was located based on information obtained during an improper interrogation was admissible under Elstad). Our review of this issue is limited to whether the state should have been permitted to present evidence of the statement itself.
[6]. see discussion supra, note 4.
[7] We note that in Taylor v. State, 337 So.2d 773 775 (Ala.Crim.App. 1976), the Court of Criminal Appeals, relying on Lawnv. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321
(1958), held that, in general, "once the court has ruled on a motion to suppress, supported by competent evidence as to the validity vel non of the search and seizure, it is not necessary for the defendant again at the trial to object to the evidence on constitutional grounds, and that the failure to do so does not constitute a waiver," unless special circumstances require further objection. See also Tillman v. City of Enterprise,627 So.2d 1160, 1161 (Ala.Crim.App. 1993); Smith v. State612 So.2d 1314 (Ala.Crim.App. 1992) (applying rule to pretrial motion challenging photographic lineup), overruled on other grounds, Exparte Thomas, 659 So.2d 3 (Ala. 1994).
At first blush, this rule seems to contradict the general rule, expressed in Liberty Nat'l Life Ins. Co. v. Beasley,466 So.2d 935, 936 (Ala. 1985), that "an appellant who suffers an adverse ruling on a motion to exclude evidence . . . made in limine, preserves this adverse ruling for post judgment and appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary. "
Because this issue has not been addressed by either the parties or the Court of Criminal Appeals, we decline to address whether the rule expressed in Taylor is a proper statement of the law and, if so, whether it is applicable to the case at hand. Moreover, Price did not specifically allege at the pretrial suppression hearing that the State failed to prove that he had been properly advised of his Miranda rights; therefore, an objection might have been required even if the rule described above is applicable to this case.
In any event, it is clear that even if Price properly preserved this issue for appellate review, any error with regard to the admission of evidence or the Alabama statement was harmless in this case. Cf. Bush v. State, 523 So.2d at 557; Kinder v. State, 515 So.2d at 69.
[8] See discussion, supra, note 7.
[9] At the pretrial suppression hearing, Sheriff Turner testified that Price was not threatened or pressured, and was not offered any reward or inducement, to provide his statement.
[EDITORS' NOTE: PAGES 1075-1094 CONTAIN DECISIONS WITHOUT PUBLISHED OPINIONS]
 *Page 1