IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. OLIVIA WASHBURN

**Direct Appeal from the Circuit Court for Henderson County**
**No. 99-065-2T1     Roy B. Morgan, Jr., Judge**

---

**No. W2001-01847-CCA-R3-CD  - Filed June 11, 2002**

---

A Henderson County Circuit Court jury found the defendant, Olivia Washburn, guilty of the sale and delivery of .5 grams or more of cocaine, Class B felonies, and assessed two separate $25,000 fines. The trial court sentenced the defendant as a Range I, standard offender, imposed an eight-year sentence to be served in the Tennessee Department of Correction, and merged the fines so that the defendant was  ordered to pay a total of $25,000.  On appeal, the defendant argues that the trial court erred in concluding both that her statement to law enforcement officers was voluntary and that the evidence against her was sufficient, as well as in allowing into evidence a videotape not produced to the defense.  These assignments are without merit.  However, we conclude that the trial court erred in admitting the defendant's statement without considering whether the probative value of the numerous references to other drug offenses outweighed their prejudicial effect.  The judgments of the trial court are reversed, and the matter is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded for a New Trial**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Olivia Washburn.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; James G. Woodall, District Attorney General; and Bill R. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was indicted for sale of cocaine over .5 grams, delivery of cocaine over .5 grams, two counts of sale of methamphetamine, and two counts of delivery of methamphetamine, these offenses alleged to have occurred on three occasions in October, November, and December

1998. Following a trial, she was convicted only of the counts alleging that she sold (Count 1) and delivered (Count 2) more than .5 grams of cocaine "on or about December 30, 1998." She then timely appealed these convictions. Upon review, we conclude that it was error to allow the State to present testimony of the defendant's admission to numerous other drug offenses without considering whether the prejudicial effect of these admissions outweighed their probative value. Accordingly, we reverse the judgments of conviction and remand this matter for a new trial.

## FACTS

Lynn Williams testified that she had known the defendant for ten years, getting to know her better after hiring a friend of the defendant's to work at the Amoco convenience store in Lexington. The defendant first came to the Amoco to see her friend but later came because she and the defendant had a "drug relationship" that continued until September of 1998. Williams said that she stole money from her employer in order to buy drugs. Learning of the theft, her employer agreed that if she paid the money back, no charges would be pressed against her. She testified that she did repay the money and no charges were filed.

On the day that Williams and her employer made this agreement, Officer Michael Harper came to her house, as a friend, and asked her what happened at the Amoco convenience store. Harper came back the next day and asked who had been selling her the drugs. She told him and agreed to be a paid, confidential informant for the Lexington Police Department. In that capacity, Williams called the defendant and arranged to buy a gram of cocaine on approximately October 29, 1998. Williams was fitted with a "wire" and searched by Officer Lisa Scott, while Officers Michael Harper and Todd Bowman searched Williams's car. The officers provided her with $100 to buy the drugs from the defendant, and she drove to the Smokehouse Tobacco Store in Lexington where the defendant worked. The officers followed her in a separate vehicle. At the drive-thru window of the store, the defendant gave her the drugs and she handed the defendant the money. Williams said she drove immediately back to Officer Harper's residence and gave the drugs to Harper. Officer Scott removed the wire and searched her again, and Officers Harper and Bowman searched her car a second time.

Williams said she agreed to be an informant a second time on approximately November 28, 1998. She called the defendant again and arranged to buy the drugs the next day. She was searched and wired by Officer Scott, and Officers Harper and Bowman searched her car before she made the buy. They gave her another $100, and she went to the Smokehouse Tobacco Store's drive-thru window, gave the defendant the money, and the defendant gave her the drugs. She returned to Officer Harper's residence, where she gave the drugs to Officer Bowman, and she and her car were searched again.

Williams testified that she acted as an informant a third time at the end of December 1998. She said Officer Harper wanted her to make a videotaped drug buy with the help of the Tennessee Bureau of Investigation ("TBI"). She went to the Jackson Civic Center to meet two TBI agents, one of whom was Gary Azbill. They put a microphone and video camera inside her car prior to the

December drug transaction. The agents asked her to call the defendant and request two "eight balls" of cocaine, which is a package of cocaine containing three and a half grams. Williams said the defendant raised the price once before saying that she could get the two "eight balls" for $200 each. She and her vehicle were searched, and the TBI agents gave her $400 to make the buy. She then bought the drugs from the defendant at the Smokehouse Tobacco Store and returned to Officer Harper's residence. Williams testified that she gave the drugs to Special Agent Azbill. She said Officer Scott searched her, and she thought her car was searched while she was inside.

Lisa Mays, the TBI forensic scientist who tested the samples from the three drug purchases from the defendant, testified that the drugs from the first two sales contained .3 grams of methamphetamine, rather than cocaine. Mays said that a lay person could mistake cocaine, which is a white powder, for methamphetamine, which is sometimes in the form of a white powder. She also testified that the drugs from the December 30, 1998, transaction were determined to be 4.1 grams of cocaine.

Michael Harper, an investigator for the Lexington Police Department, testified. His testimony corresponded with that of Lynn Williams regarding the October, November, and December 1998 drug transactions with the defendant. Harper said that he originally talked to Williams, as a friend, about the money she stole from her employer, and was never part of any investigation in the matter. Officer Harper and the other officers followed Williams each of the three times she bought the drugs from the defendant. The tapes they made from her wire for these sales were turned over to TBI Special Agent Gary Azbill, as were the drugs recovered from each of the three transactions. He said that he and the other officers did a thorough search of the informant's car each time and did not find any controlled substances.

Gary Azbill, a special agent with the TBI, testified that he became involved in this case when his boss instructed him to assist the Lexington Police Department in making an undercover drug buy. He and Special Agent Jimmy Barnes met with Williams, and Barnes installed a camera and transmitter in her car. Officer Harper gave him an audiotape of the informant's December telephone conversation setting up the drug buy with the defendant. However, Azbill said there were no tapes of the October and November drug transactions. He said that he, Barnes, Harper, and Bowman searched Williams's car and found no contraband before she was sent to buy the drugs on December 30, 1998.

Officer Lisa Scott of the Lexington Police Department testified that she searched Lynn Williams on October 29, 1998, and November 28, 1998, at Officer Harper's residence before and after Williams bought the drugs. She also put a wire on Williams on those two dates and never found contraband on Williams during her searches. Officer Scott testified that she did not search Williams on December 30, 1998.

Officer Todd Bowman of the Lexington Police Department testified, and much of his testimony corresponded with that of Officer Harper's as to the drug transactions between the informant and the defendant in October, November, and December of 1998.

Jimmy Barnes, a special agent with the TBI, testified that he made an audiotape of the December drug transaction between Williams and the defendant from the wire that was placed on Williams. He also made a videotape of the transaction by placing a small camera inside Williams's car and later merged the audiotape and the videotape of the December 30, 1998, drug sale. The State asked Agent Barnes to identify an unedited videotape that recorded the entire December drug transaction from the time the officers turned the camera "on" to the time that Williams turned over the drugs at Officer Harper's residence. Defense counsel objected to the tape, claiming that this long, unedited version of the December drug transaction had not been provided to him. He said that he was only given a shorter videotape that only covered the actual drug transaction. The trial court allowed defense counsel to view the entire unedited version of the tape and question Barnes outside the presence of the jury before admitting the tape into evidence. Barnes testified that he was the one who turned the tape "off" when Williams returned to Harper's residence after the December drug transaction. The prosecution then rested its case.

The defendant testified that Lynn Williams had called her in December to ask if she could get a dietary supplement called Vitablend, and on December 30, 1998, she sold Williams a fairly large portion of Vitablend. The telephone conversations she had with Williams from October to December of 1998 were about Vitablend. She also said that since Vitablend is a white powdery substance, it looks like cocaine. She testified that she was held for four hours after being arrested without being allowed to speak with an attorney or call her father. She said that Special Agent Azbill "concocted" her statement and that she made no admission of guilt to the officers at any time. She said that she never read or signed the statements about which Special Agent Azbill testified. She denied selling methamphetamine to Williams on October 29 or November 28 of 1998, or selling cocaine to her on December 30, 1998.

After the defense had rested, Lynn Williams was recalled by the State as a rebuttal witness, and denied that she had bought dietary supplements from the defendant at any time.

## ANALYSIS

### I. Erroneous Admission of Defendant's Statement

The defendant argues on appeal that the trial court erred in admitting her statement both because it was involuntary and because it included evidence of criminal conduct for which she had "neither been charged nor convicted."

### A. Voluntariness of the Statement

The defendant argues that her statement to the police was involuntary, apparently because of "her emotional state at the time of her arrest," her request to have an attorney or her father present, and because she gave the statement to avoid being prosecuted for the marijuana found in her car.

We have one initial consideration as to whether the defendant's statement was "voluntary." Agents Azbill and Barnes testified at the hearing on the motion to suppress only that the defendant was advised of her "<u>Miranda</u> rights," without specifying the specific rights of which she was advised. Simply because a "card" listing <u>Miranda</u> rights is read to a suspect, as apparently occurred here, does not mean that we must assume that the advice was complete and accurate. If there is an advice of rights issue, the record should reflect the specific rights of which the defendant was advised. <u>See</u> <u>Ex parte Price</u>, 725 So. 2d 1063, 1070 (Ala. 1998), <u>cert. denied</u>, 526 U.S. 1133, 119 S. Ct. 1809, 143 L. Ed. 2d 1012 (1999). However, it is unnecessary for us to ascertain in the instant appeal whether the shorthand term "<u>Miranda</u> rights" is adequate, for the defendant testified during the hearing that she was aware of her <u>Miranda</u> rights, having been advised of them during two prior arrests.

In <u>Miranda v. Arizona</u>, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706 (1966). The privilege against self-incrimination is spelled out in the text of the Fifth Amendment, which states that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Where an "interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." <u>Id.</u> at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724 (citing <u>Escobedo v. Illinois</u>, 378 U.S. 478, 490 n.14 (1964)). The Court explained that "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." <u>Id.</u> at 476, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725.

Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Whether a waiver of this right is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the rights were waived. <u>See</u> <u>State v. Callahan</u>, 979 S.W.2d 577, 581 (Tenn. 1998). However, this court has stated that a court may not conclude that a defendant's confession was constitutionally involuntary based on the defendant's "subjective perception" that it was involuntarily obtained. <u>State v. Smith</u>, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000), <u>perm. to appeal denied</u> (Tenn. 2001) (citing <u>Smith</u>, 933 S.W.2d at 455).

At the hearing on the defendant's motion to suppress, Special Agent Gary Azbill described the circumstances surrounding the defendant's statement:

> Q  Did you advise [the defendant] as far as why she was being picked up and/or arrested?
>
> A  Yes, sir, we did. At the time we arrested her at her workplace, we told her why she was being arrested.

Q    And, was she advised of her <u>Miranda</u> rights?

A    Yes, sir, she was, twice as a matter of fact. That's not usually commonplace, but Special Agent Barnes advised her of her <u>Miranda</u> rights there at the store, and, of course, she was transported, and then I advised her again prior to starting the interview at the police department.

. . . .

Q    Would it be fair to say that she was very cooperative with you?

A    Yes, sir, she was. We were wanting her cooperation, too. She was cooperative, and we were hoping to go further with this investigation with others that were supplying her with drugs.

Q    Did she at any time request a lawyer?

A    Absolutely not.

Q    Did she at any time request that the interview stop until she had the chance to converse with anybody about the situation?

A    No, sir, she didn't.

Q    Was there any type of discussion in relation to this interview as far as negotiation or compromise in relation to her charge?

A    No, sir.

Q    Were the statements given voluntarily or involuntarily?

A    They were voluntary.

Agent Azbill said he did not discuss with the defendant the setting of a bond and told her that she would not be charged with possession of marijuana.

However, he testified only in general terms as to the statement without relating in detail what the defendant had told him:

Basically she admitted to selling drugs there at her workplace from December of '98 I think 'til March or April of '99. We didn't get into specifics because we were kind of protecting the cases to the

-6-

particular incident we were concerned about, the undercover buys that happened there, but we talked about other instances with other sales, and she admitted to selling methamphetamine, cocaine at the store.

During the hearing, the defendant testified that she was "very upset" and "[v]ery unstable emotionally" at the time of the statement. She asked that her father be called, and was told that would not be done. She was not allowed to telephone her father or make any other calls. She asked "for any kind of legal counsel" to tell her what she "needed to do," but was told that she "did not need anyone." She was told that by cooperating she would get a lower bond and would not be prosecuted for the marijuana found in her car.

At the conclusion of the hearing, the trial court found that the defendant's statement was voluntary:

> I do find from the proof today that this Defendant did freely and voluntarily waive her <u>Miranda</u> rights at the time and gave this statement.

> There are some issues I'm sure that can be brought out if this goes to jury trial. Mr. Mosier and Mr. Martin will both be able to skillfully do that, but she had been advised of <u>Miranda</u> before. There's some dispute as to whether she was advised once or twice on this occasion, but by her own admissions at least once. It's preferable certainly that things are in writing, but there's no rule requiring that. She did give written consent to search.

> I think under the circumstances, and I do have to look at the totality of the circumstances, that she was properly advised and, again, that she freely and voluntarily raised those rights and gave whatever statement she gave.

However, the trial court reserved ruling on the use to which the statement could be put at trial:

> And as to the utilization of those statements for purposes of trial, I'll have to address that prior to any trial.

The factual findings made by the trial court at a hearing on a motion to suppress are binding on the appellate court unless the evidence preponderates against them. <u>State v. Ross</u>, 49 S.W.3d 833, 839 (Tenn. 2001). Having the opportunity to view the witnesses as they testify enables the trial court to assess their credibility, resolve evidentiary conflicts and determine the weight and value to be given the evidence. <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). We are not bound by the trial court's conclusions of law, <u>State v. Simpson</u>, 968 S.W.2d 776, 779 (Tenn. 1998), and review *de novo*

its application of the law to the facts. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

The evidence from the motion to suppress hearing provides sufficient proof to rebut the defendant's claim that her statement was not voluntary. The record does not preponderate against the trial court's determination that the defendant was advised of her Miranda rights and voluntarily waived these rights when she made her statement to Special Agent Azbill. Thus, we conclude that the trial court did not err when it refused to suppress the defendant's statement.

### B. Irrelevant Nature and Prejudicial Effect of Defendant's Statement

The defendant argues on appeal that her statement, as recited at trial by Agent Azbill, should not have been admitted because it was irrelevant and violated Tennessee Rule of Evidence 404(b). The State responds on appeal that the statement was admissible to show identity and common scheme or plan.

At trial, defense counsel objected as Agent Azbill was asked on direct examination to recite the defendant's statement and, at a bench conference following an objection to this testimony, defense counsel explained why the statement should not be admitted:

> MR. MOSIER: Judge, he's going into a lot of conduct prior to these three occasions that she's been neither charged with or convicted of. It's a big catharsis where she admits a lot of things in very general terms, but it has nothing to do – They don't even ask her a question about these three buys. It has nothing to do with it.
>
> MR. MARTIN: Your Honor, we've been through all of this on the Motion to Suppress the Court has previously heard and has ruled that the statement was eligible to be admitted and proper, and we feel like that we're entitled to do that.[1]
>
> THE COURT: I remember we went through the Motion to Supress [sic] and I overruled the defense motion. Now whether discussions have been had prior to this very moment about the inadmissibility of the statement . . .
>
> MR. MOSIER: Well, Judge I said something that day, and, of course, that's – I didn't really expect Mr. Martin to seek to introduce it because – Would you like to look at it?

---

[1]At the motion to suppress, as we have previously set out, the trial court said, after determining that the defendant's statement was voluntary, "[A]s to the utilization of those statements for purposes of trial, I'll have to address that prior to any trial." Thus, the State's characterization of the trial court's ruling as to the statement appears not to have been entirely accurate.

THE COURT:  Well, I remember some of it.

MR. MOSIER:  [Mr. Martin], you can probably get yours easier than I can get mine.

THE COURT:  Mr. Mosier, do you agree in this statement I'm now viewing has been deemed to be admissible in the past over the objection that she does cover the time period in question?

MR. MOSIER:  From December of '98 to March of '99.

THE COURT: Some of which of these prior counts are included. Any further argument you want to make?

MR. MOSIER:  No, sir.  What the Court ruled on was that that statement was voluntarily given.  I just don't think it's relevant to what she's on trial here for today.  They talked about a lot of stuff in there.[2]

THE COURT:  Based upon defense's objection as to relevancy, it having already been ruled the statement was freely and voluntarily given after advising her of her rights, I'm going to allow the statement to be admitted today.  You may proceed.

Since the contents of the statement had not been recounted by the State's witnesses during the hearing on the motion to suppress, the trial court heard this statement of the defendant for the first time as the jury also was hearing it over the defense objection:

Q    Officer Azbill, after you arrested [the defendant] on or about June the 8th of 1999 when you all went to the Lexington Police Department to interview her, did you advise her of her Miranda rights?

A    Yes, sir, I did.

Q    And thereafter, did she subsequently voluntarily give you a statement?

A    Yes, sir, she did.

---

[2]Although the State argues on appeal that the defendant did not object at trial to the prejudicial effect of her statement, we believe that the proceedings during this bench conference sufficiently raised the issue, which also was presented in the motion for new trial.

Q  What did she tell you?

A  She told me she'd been selling cocaine and methamphetamine at the Smokehouse from December of '98 through March of '99 and that she regularly sold to Kelly Clenny at the store and brought out some marijuana at the store every two or three days.

She also stated she bought her cocaine from two blacks in Jackson named Tyrone and Travis. She stated she didn't know what their last name was, but she knew where they lived and it was near Jackson State college. She said she'd bought off these two guys approximately 50 times, paying $400 per eight ball. She stated that this Tyrone had a baby blue BMW and that Travis had no car, and both of the subjects were thought to have lived in and around Wallace Road, but she would meet at those new apartments near Jackson State.

She also stated she got her methamphetamine from Debbie who's a cook at the Bull Market at Parker's Crossroads. She said she purchased directly from Debbie five times, one gram at a time.

Prior to that she stated Rob Hamilton was furnishing her the methamphetamine and she had gotten methamphetamine from him approximately 15 times, a gram at a time. During this time she state [sic] Rob was buying methamphetamine from Marsha Bedwell.

She also stated her willingness to cooperate with authorities and admitting to selling cocaine and meth [sic] at her father's business, the Smokehouse. She wanted to help authorities to catch Barbara Keller, a lady in Jackson. She stated Ms. Keller had got her addicted to cocaine and they had started smoking marijuana together. She stated that Keller had been busted recently in Jackson for possession of cocaine and was still in jail, or was not out of jail yet.

Q  Would it be clear from her statement the time frame that she had mentioned covered the sale in which you were involved?

A  Yes, sir.

This court will not reverse a trial court's decision to admit evidence based on its relevance unless the trial court has abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Abuse of discretion occurs when the "trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party

complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). Accordingly, "[a]lthough a decision made under this standard will not be lightly reversed on appeal, the discretion of the trial court is not without limits." State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000). Here, no legal standard was applied at trial because the trial court was misadvised as to the scope of its prior ruling.

In assessing this issue, we first note that, during questioning, the defendant had not even been asked if she had sold methamphetamine from the Smokehouse on the first two dates specified in the indictment, although she had said that she had done so beginning in December 1998. At the motion to suppress, Agent Azbill explained the general nature of the statement by saying that the defendant was not asked about sales on specific dates because officers did not want to reveal to her the identity of their informant.

According to the statement, the defendant admitted her guilt as to a number of drug offenses:

1. "selling cocaine and methamphetamine at the Smokehouse from December of '98 though March of '99";

2. "regularly" selling drugs to "Kelly Clenny at the store";

3. bringing "some marijuana at the store every two or three days";

4. buying cocaine from Travis and Tyrone "approximately 50 times, paying $400 per eight ball";

5. purchasing methamphetamine "from Debbie [a cook at the Bull Market at Parker's Crossroads] . . . five times, one gram at a time";

6. buying methamphetamine from Rob Hamilton "approximately 15 times, a gram at a time"; and

7. smoking marijuana with Barbara Keller.

The State argues on appeal that, apparently, the entire statement was admissible to prove "identity" and "common scheme." We respectfully disagree that either of these late presented theories justifies bypassing the trial court's being allowed to consider this issue.

First, it is unclear how "identity" was an issue at the trial. The videotape of the December incident showed the defendant at the drive-thru window of the Smokehouse, passing a sack to the informant and receiving money in payment. The defendant admitted that it was she at the window but said that a diet aid, rather than illegal drugs, was in the sack. Thus, "identity" was not an issue.

-11-

The State also argues that evidence of other drug involvement was admissible to show a "common scheme," an evidentiary theory which is explained in Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[12][a] (4th ed. 2000):

> In Tennessee, three categories of "common scheme or plan evidence are recognized: (1) distinctive designs or "signature" crimes; (2) a larger, continuing plan or conspiracy; and (3) a common or inseparable plan or transaction, sometimes referred to as the "same transaction."

Comparing these categories with the facts of the indictments for which the defendant was charged and the panoply of drug involvement admitted to in the defendant's statement, we are unable to divine any sort of "common scheme," other than a propensity to buy, sell, and use illegal drugs. In fact, the statement covers such a gamut of offenses, it is difficult to imagine a unifying thread which would bind them. For instance, while it is arguable that proof as to sales of cocaine and methamphetamine at the Smokehouse, even after that for which the defendant was charged, might be relevant, this rationale could not be applied to much of the remainder of the statement. The vague admission that the defendant "regularly sold to Kelly Clenny at the store" requires, to be considered part of a "common scheme," that the sales were of drugs and the "store" was the Smokehouse. Even then, however, no time frame was supplied for these "sales," or explanation as to whether they occurred at the drive-thru window as did the charged offenses, in the parking lot, or inside the business. Further, it is unclear how the defendant's admission of purchases of cocaine "approximately 50 times, paying $400 per eight ball" is relevant to the three incidents for which she was being prosecuted. The same problem exists for the purchases of methamphetamine "from Debbie . . . five times, one gram at a time." In fact, the wide variety of offenses recounted in the defendant's statement create additional problems because they, like the charges being prosecuted, were all drug offenses and present a law school exam-like exercise in evidentiary admissibility.

As a result of the manner in which the defendant's statement came before the jury, we were denied the benefit of the trial court's expertise in balancing the probative value of this statement versus its prejudical effect. Even a cursory application of Tennessee Rules of Evidence 403 and 404 demonstrates the substantial evidentiary problems presented by the statement's broad admissions as to subsequent criminal activity. See State v. Maddox, 957 S.W.2d 547, 551-53 (Tenn. Crim. App. 1997). The prejudicial effect of much of this statement clearly outweighs its probative value, and we cannot conclude beyond a reasonable doubt that it did not affect the verdict in this matter.

Accordingly, we reverse the judgments of conviction and remand this matter for a new trial. Should the defendant, following a retrial, again be convicted of both counts, the trial court should consider whether the counts should be merged into a single conviction.

Because of the possibility of further appellate review, however, we will consider the defendant's remaining issues.

-12-

## II. Admissibility of the Unedited Videotape

The defendant argues that the trial court erred in allowing the longer videotape to be entered into evidence because she was not given a copy of it prior to the trial, and that the failure of the State to provide a copy violated Rule 16 of the Tennessee Rules of Criminal Procedure and Rule 32 of the Local Rules of Practice for the Twenty-Sixth Judicial District.

On appeal, the defendant argues that harm occurred because "the defendant and her counsel tediously prepared a defense in this case based upon the materials that had been furnished in the discovery process by the State." The proper remedy, according to the defendant, is a "reversal of [the defendant's] conviction and the entry of a judgment of acquittal." However, we respectfully disagree with this argument.

Rule 16(a)(1)(C) of the Tennessee Rules of Criminal Procedure provides as follows:

> Documents and Tangible Objects. – Upon request of the defendant, the State shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects . . . which are within the possession, custody or control of the State, and which are material to the preparation of the defendant's defense or are intended for use by the State as evidence in chief at the trial, or were obtained from or belong to the defendant.

Tenn. R. Crim. P. 16(a)(1)(C).

This court has previously determined that "evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). Tennessee Rule of Criminal Procedure 16(d)(2) provides guidance for dealing with claimed discovery violations:

> Failure to Comply with a Request. – If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

Tenn. R. Crim. P. 16(d)(2). Similarly, in State v. Cadle, 634 S.W.2d 623, 625 (Tenn. Crim. App. 1982), this court reviewed the different sanctions available when Rule 16 has been violated:

From a reading of [Rule 16(d)(2)], it becomes obvious that the sanction to be applied for non-compliance must fit the circumstances of the individual case. Thus, in some instances mere inspection . . . may serve to protect the defendant's interests. In other situations, a continuance may be required to give the accused a chance to meet the State's previously undisclosed evidence, or the court may be required to exclude the evidence altogether. The suitability of an individual alternative will always depend on the nature of the statement and the basis upon which it is being challenged.

Here, the trial court allowed defense counsel to view the videotape and question Special Agent Barnes about it out of the presence of the jury. The tape was then shown to the jury and entered into evidence. At the conclusion of Barnes's testimony, the trial court made an additional statement as to the tape:

So based upon what I heard and saw today, I feel that we had to proceed over defense objection. Plus, I want to note, under the rule, Rule 16, dealing with discovery, I did allow defense counsel the opportunity outside the presence of the jury to view the entire tape and question the witness about that tape before we proceeded on with the introduction of that tape into evidence.

We respectfully decline to conclude that the trial court erred in this regard. The videotape provided to the defendant showed the exchange of the small bag for cash and, with the conversation, appears to be more inculpatory than the longer version without sound. We conclude that the trial court resolved the dispute in a reasonable fashion. Tenn. R. Crim. P. 16(d)(2).

This assignment is without merit.

### III. Sufficiency of the Evidence

The defendant argues that there was insufficient evidence to support her conviction for the sale and delivery of .5 grams or more of cocaine.

Whenever a defendant raises sufficiency of the evidence on appeal, this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See

-14-

State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of two counts of violating Tennessee Code Annotated section 39-17-417(c)(1) (1997), knowingly selling .5 grams or more of cocaine and knowingly delivering .5 grams or more of cocaine. At trial, the State presented an unedited videotape showing the drug transaction between the informant and the defendant on December 30, 1998. The videotape showed the informant pulling up to the Smokehouse drive-thru window, handing the defendant money, and receiving a small bag from the defendant in return. The contents of the bag were turned over to the TBI and were found to contain 4.1 grams of cocaine.

We have already concluded that the trial court did not err in entering the unedited videotape into evidence. Taking into account the evidence of the unedited videotape of the December 30, 1998, drug transaction between the informant and the defendant as well as other evidence in the record, we conclude there is more than sufficient evidence to support the defendant's convictions for the sale and delivery of .5 grams or more of cocaine. This issue is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we reverse the defendant's convictions and remand the matter for a new trial.

_____
ALAN E. GLENN, JUDGE