# SUPREME COURT OF THE UNITED STATES

CHRISTOPHER LEE PRICE, PETITIONER *v.*
JEFFERSON S. DUNN, COMMISSIONER,
ALABAMA DEPARTMENT OF
CORRECTIONS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 18–1249   Decided May 13, 2019

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE ALITO and JUSTICE GORSUCH join, concurring in the denial of certiorari.

I concur in the denial of certiorari. I write separately to set the record straight regarding the Court's earlier orders vacating the stays of execution entered by the District Court and the Court of Appeals in this case. See *Dunn* v. *Price*, 587 U. S. ___ (2019). In a late-night dissenting opinion accompanying one of those orders, JUSTICE BREYER asserted that petitioner's death sentence was being "carried out in an arbitrary way" and that Members of this Court deviated from "basic principles of fairness." *Id.*, at ___, ___ (slip op., at 1, 7). There is nothing of substance to these assertions. An accurate recounting of the circumstances leading to the now-delayed execution makes clear that petitioner's execution was set to proceed in a procedurally unremarkable and constitutionally acceptable manner.

I

The dissent omitted any discussion of the murder that warranted petitioner's sentence of death and the extensive procedural protections afforded to him before his last-minute, dilatory filings. I therefore begin by more fully recounting the "circumstances as they [were] presented to

our Court." *Id.*, at ___ (slip op., at 1).

On the evening of Sunday, December 22, 1991, Bill Lynn, a minister, and his wife Bessie returned home after church. *Price* v. *State*, 725 So. 2d 1003, 1011 (Ala. Crim. App. 1997). Bill began assembling Christmas toys for his grandchildren while Bessie prepared for bed. *Ibid.* After the electricity appeared to fail, Bill went outside to check the power box. *Ibid.* He was then brutally attacked with a sword and a knife by petitioner and his accomplice. *Id.*, at 1011, 1015. According to the trial court, Bill suffered a total of 38 "cuts, lacerations, and stab wounds." App. to Pet. for Cert., O.T. 2018, No. 18–8766, p. 230a (18–8766 App.). "One of his arms was almost severed," and "[h]is scalp was detached from [his] skull." *Ibid.* Bessie tried to call the police, but the phone lines were cut. *Price*, 725 So. 2d, at 1011. When she tried to escape and go get help, petitioner and his accomplice ordered her out of the van and attacked her, too. *Ibid.* They also stole checks, cash, and firearms, and even demanded Bessie hand over her wedding bands. *Id.*, at 1011–1012. Bill "died a slow, lingering and painful death." 18–8766 App., at 230a.

Petitioner later confessed, and an Alabama jury convicted him of capital murder and first-degree robbery. *Price*, 725 So. 2d, at 1011–1012. The jury recommended death, which the trial court imposed after finding that the killing was committed during the course of a robbery and that it was particularly heinous, atrocious, or cruel. *Id.*, at 1011, 1034–1035. Petitioner's conviction and sentence were affirmed on direct appeal and his conviction became final in 1999. See *Price*, 725 So. 2d 1003, aff'd, *Ex parte Price*, 725 So. 2d 1063 (Ala. 1998), cert. denied, 526 U. S. 1133 (1999).

Twenty years later, after multiple unsuccessful attempts to obtain postconviction relief,* petitioner brought

——————

*See *Price* v. *State*, 880 So. 2d 502 (Ala. Crim. App. 2003) (Table);

an action under 42 U. S. C. §1983 attacking the constitutionality of the State's lethal injection protocol. Record in *Price* v. *Dunn*, No. 14–cv–472 (SD Ala.), Doc. 1 (Record 14–cv–472). Following our decision in *Glossip* v. *Gross*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 13), which confirmed that prisoners challenging a State's method of execution must "establish the existence of a known and available alternative method of execution that would entail a significantly less severe risk" of pain, petitioner amended his complaint to propose an alternative compounded drug. See Record 14–cv–472, Doc. 32, p. 19–20. The District Court entered judgment for the State, explaining that petitioner had failed to show that this alternative was readily available. App. to Pet. for Cert. 38a–39a.

While petitioner's appeal was pending before the Eleventh Circuit, Alabama enacted Act 2018–353, which approved nitrogen hypoxia as an alternative to lethal injection. Death-row inmates whose convictions were final before June 1, 2018, had 30 days from that date to elect to be executed via nitrogen hypoxia. Ala. Code §15–18–82.1(b)(2) (2018). As the Eleventh Circuit noted in affirming the District Court, petitioner did not do so. *Price* v. *Commissioner*, *Ala. Dept. of Corrections*, 752 Fed. Appx. 701, 703, n. 3 (2018).

According to JUSTICE BREYER, the warden may not have given petitioner an election form until "72 hours" before the June 30 deadline. *Price*, 587 U. S., at \_\_\_ (slip op., at 5). That "possibil[ity]," *ibid.*, even if true, is irrelevant. As an initial matter, petitioner (like all other individuals) is presumed to be aware of the law and thus the June 30 deadline. Moreover, the Alabama statute neither required special notice to inmates nor mandated the use of a particular form. It merely required that the election be "per-

---

*Price* v. *Allen*, 679 F. 3d 1315 (CA11 2012), cert. denied, 568 U. S. 1212 (2013); *Price* v. *State*, 265 So. 3d 366 (Ala. Crim. App. 2017) (Table).

sonally made by the [inmate] in writing and delivered to
the warden." Ala. Code §15–18–82.1(b)(2). Cynthia Stew-
art, the warden at Holman Correctional Facility, went
beyond what the statute required by affirmatively provid-
ing death-row inmates at Holman a written election form
and an envelope in which they could return it to her. 18–
8766 App., at 181a. No fewer than 48 other inmates took
advantage of this election. Petitioner did not, even though
he was represented throughout this time period by a well-
heeled Boston law firm.

It was not until January 27, 2019—two weeks after the
State sought to set an execution date and six months after
petitioner declined to elect nitrogen hypoxia—that peti-
tioner's counsel asked the warden, for the first time, that
petitioner be executed through nitrogen hypoxia instead of
lethal injection. The warden explained that she was un-
able to accept the belated request under state law. Peti-
tioner's counsel then approached the State's counsel, who
gave the same response. On February 8, petitioner filed
another §1983 action challenging the constitutionality of
Alabama's lethal injection protocol under the Eighth
Amendment and proposing nitrogen hypoxia as an alter-
native. See *Bucklew* v. *Precythe*, 587 U. S. ___, ___ (2019)
(slip op., at 20) (requiring a prisoner bringing a §1983
method of execution claim to "identif[y] a feasible and
readily implemented alternative method of execution the
State refused to adopt without a legitimate reason, even
though it would significantly reduce a substantial risk of
severe pain"). On March 1, the Alabama Supreme Court
set petitioner's execution date for April 11.

On April 5, the District Court denied petitioner's motion
for a preliminary injunction to stay his execution pending
resolution of his new §1983 claim. 18–8766 App., at 54a.
The court found that nitrogen hypoxia could not be "read-
ily implemented" because although Alabama had legally
approved nitrogen hypoxia as a future method of execu-

tion, the State was still preparing its execution protocol. *Id.,* at 48a–49a. It also found that the State had "legitimate reason[s]" for declining to use nitrogen hypoxia— namely, that petitioner failed to comply with the statutory deadline. *Id.*, at 49a–50a. But the court stated that petitioner was likely to prevail on the question whether execution by nitrogen "would provide a significant reduction in the substantial risk of severe pain" as compared to execution by lethal injection. *Id.*, at 52a. That same day, petitioner filed a motion for reconsideration in which he proposed, for the first time, his own one-page "execution protocol" for nitrogen hypoxia. Record in *Price* v. *Dunn*, No. 19–0057, Doc. 33, at 4, and n. 2 (Record No. 19–0057). The court denied the motion because petitioner "still fail[ed] to show that [a nitrogen hypoxia execution protocol] may be readily implemented by the State and that the State does not have [a] legitimate reason for refusing his untimely request." 18–8766 App., at 28a.

On April 10, the Eleventh Circuit affirmed on alternative grounds and denied petitioner's motion to stay his execution. *Price* v. *Commissioner, Ala. Dept. of Corrections*, 920 F. 3d 1317 (2019). The court acknowledged that petitioner "did not come forward with sufficient detail about how the State could implement nitrogen hypoxia to satisfy *Bucklew*'s requirement where the inmate proposes a new method of execution." *Id.*, at 1328. But it concluded that this failure was irrelevant because the State had officially adopted that method of execution. *Id.*, at 1328– 1329. Nonetheless, the court held that the District Court erred in concluding that petitioner had met his burden to show that his proposed alternative method would significantly reduce the risk of substantial pain. *Id.*, at 1329– 1331. In particular, the court held that the District Court had before it "no reliable evidence" from which to conclude that nitrogen would reduce petitioner's risk of pain in execution, as compared to the lethal injection protocol.

*Id.*, at 1330. It noted that in reaching the contrary conclusion, the District Court had relied on a preliminary draft report by East Central University marked "Do Not Cite." *Ibid.*

A few hours before his scheduled execution on April 11, petitioner filed a petition for a writ of certiorari and an accompanying application for a stay of his execution. *Price* v. *Dunn*, O.T. 2018, No. 18–8766 (18A1044). While that petition and application were pending here, and before any mandate issued from the Eleventh Circuit, petitioner filed yet another motion for a preliminary injunction in the District Court. Record No. 19–0057, Doc. 45. Petitioner attached several affidavits and a final version of the report by the East Central University. The District Court granted a stay approximately two hours before the scheduled execution time of 6 p.m. central time, holding that, in light of the Eleventh Circuit's opinion and the new submissions, petitioner had now demonstrated a likelihood of success on the merits. *Id.*, Doc. 49, at 9–10, 13. The State immediately filed in the Eleventh Circuit a motion to vacate on the ground that the District Court lacked jurisdiction over the case, which was still at the Eleventh Circuit. But the Eleventh Circuit entered its own stay "in light of the jurisdictional questions raised by the parties' motions." 2019 WL1591475, *1 (Apr. 11, 2019). The State then promptly filed an application to vacate the stays in this Court so that it could carry out the execution as planned before the warrant expired at midnight. *Dunn* v. *Price*, O.T. 2018, No. 18A1053.

## II

We granted the State's application to vacate the stays. Consistent with our usual practice in resolving eleventh-hour applications, we did not issue a full opinion explaining our reasoning. Yet our brief order was not issued until hours after the execution warrant had already expired.

The Court's delay in issuing the order happens to have the same effect as JUSTICE BREYER's preferred course of action. As he explained in his dissent, he preferred to discuss the matter at Conference the following day, which would require the State to "obtain a new execution warrant, thus delaying the execution." *Price*, 587 U. S., at \_\_\_–\_\_\_ (slip op., at 4–5). JUSTICE BREYER asserted that "delay was warranted" in part because the legal issues raised were "substantial." *Id.*, at \_\_\_ (slip op., at 5). That rationale does not withstand even minimal legal scrutiny.

JUSTICE BREYER framed the issue before the Court as "the right of a condemned inmate not to be subjected to cruel and unusual punishment in violation of the Eighth Amendment." *Id.*, at \_\_\_ (slip op., at 6). That framing was incorrect. The issue before the Court was whether the lower courts abused their discretion in staying the execution. For three independent reasons—all raised by the State in its application—the State was entitled to vacatur. The dissent failed to adequately address any of them.

First, the District Court abused its discretion in granting a preliminary injunction because it manifestly lacked jurisdiction over the case, which was pending in the Court of Appeals. It is well settled that "[f]iling a notice of appeal," as petitioner did, "transfers adjudicatory authority from the district court to the court of appeals." *Manrique* v. *United States*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 3). "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs* v. *Provident Consumer Discount Co.*, 459 U. S. 56, 58 (1982) (*per curiam*). Thus, as the Eleventh Circuit has long recognized, "a district court generally is without jurisdiction to rule in a case that is on appeal"—even after the court has rendered a decision—"until the mandate has issued." *Zaklama* v. *Mt. Sinai Medical Center*, 906 F. 2d

645, 649 (1990); see also *Kusay* v. *United States*, 62 F. 3d 192, 194 (CA7 1995) (Easterbrook, J.) (until the Court of Appeals issues its mandate, the case remains in the Court of Appeals, and "any action by the district court is a nullity"); 16AA C. Wright & A. Miller, Federal Practice and Procedure §3987, p. 612 (3d ed. 2008) (Wright & Miller). In this case, there was no dispute that the Eleventh Circuit had not yet issued its mandate when petitioner sought a preliminary injunction from the District Court on the same issues pending in the Court of Appeals. The District Court therefore lacked authority to grant the preliminary injunction, and the Court of Appeals abused its discretion in granting a stay instead of vacating the preliminary injunction.

Even if the Eleventh Circuit believed that the jurisdictional issue was difficult, that belief still would not have been a sufficient reason to grant a stay. Under the traditional stay factors, a petitioner is required to make "'a strong showing that he is likely to succeed on the merits.'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). It is not enough, as the dissent suggests, that the question be "substantial." *Price*, 587 U. S., at ___ (slip op., at 5). But the question is not even "substantial." The dissent relied only on an out-of-context quote from a treatise to support its position that this jurisdictional question was difficult. See *id.*, at ___ (slip op., at 6) ("'An interlocutory appeal ordinarily suspends the power of the district court to modify the order subject to appeal, but does not oust district-court jurisdiction to continue with proceedings that do not threaten the orderly disposition of the interlocutory appeal'" (quoting 16A Wright & Miller §3949.1, p. 50)). The section from which this statement is plucked, however, reiterates that a notice of appeal "'is an event of jurisdictional significance" that "divests the district court of its control over those aspects of the case involved in the appeal.'" See *ibid.* (quoting *Griggs*, *supra* at 58). The

exceptions to this rule pertain to matters outside the scope of the appeal or in aid of the Court of Appeals' jurisdiction, such as taxing costs, awarding attorney's fees, or reducing to writing an earlier oral decision without altering its substance. 16A Wright & Miller §3949.1. Those exceptions were not applicable to petitioner's case. The issue before the Eleventh Circuit was whether petitioner was entitled to a preliminary injunction based on petitioner's claim that he should be executed using nitrogen hypoxia—the exact claim petitioner raised in the District Court. There is no question that the District Court was deprived of jurisdiction to hear the identical claim and award the exact same relief petitioner sought from the Eleventh Circuit. To suggest that this question was difficult or that the Court was "deeply misguided" to follow black-letter law is at best disingenuous. See *Price*, 587 U. S., at \_\_\_ (slip op., at 6).

Second, the Eleventh Circuit did not consider how petitioner's unjustified delay in presenting his "new evidence" to the District Court factored into the equitable considerations of a stay. See *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006) (equity weighs against a stay when "'a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay'"). Notably, the Eleventh Circuit did not conclude that petitioner's new affidavits or the "final" version of the report made him likely to succeed on the merits or that those materials were unavailable to him earlier. And more broadly, petitioner delayed in bringing this successive §1983 action until almost a year after Alabama enacted the legislation authorizing nitrogen hypoxia as an alternative method, six months after he forwent electing it as his preferred method, and weeks after the State sought to set an execution date. There is simply no plausible explanation for the delay other than litigation strategy. A stay under these circumstances—in which the petitioner inexcusably filed

additional evidence hours before his scheduled execution after delaying bringing his challenge in the first place— only encourages the proliferation of dilatory litigation strategies that we have recently and repeatedly sought to discourage. See *Bucklew*, 587 U. S., at \_\_\_–\_\_\_ (slip op., at 30–31); *Dunn* v. *Ray*, 586 U. S. \_\_\_, \_\_\_\_ (2019) (slip op., at 1).

Third, petitioner was unlikely to succeed on the merits of his method-of-execution claim. The three-drug protocol petitioner attacks is the very one we upheld in *Glossip*. And the Eleventh Circuit's April 10 analysis about whether nitrogen hypoxia was "available" and could be "readily implemented" was suspect under our precedent. As we recently held, "the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Bucklew*, *supra*, at \_\_\_ (slip op., at 21) (internal quotation marks omitted). Here, petitioner's haphazard, one-page proposed protocol—provided for the first time in his motion for reconsideration less than a week before his scheduled execution date—was, to put it charitably, untested. It contemplated that the execution team could use a "hose fitting" to "fill" a "hood" with nitrogen gas, and then attempt to "[p]lace [the] hood over [the] inmate's head" and "secure" it with an "elastic strap/drawstring to ensure seal." Record 19–0057, Doc. 33, at 4. Even if all the equipment were available on Amazon.com, as he alleged, many details remained unanswered, particularly regarding the actual process of administering the gas and, critically, the safety of the state employees administering it. For instance, what does "a robust yet controlled flow of nitrogen" mean? *Ibid.* How full of nitrogen gas should the hood be before placing it over the inmate's head? How does one prevent nitrogen from seeping out of the hood into the execution chamber before the hood is secured? The need to settle on details like these explains why the

State has repeatedly stated that it will not be ready to implement its nitrogen hypoxia method until the end of the summer or later (and why the State requested that inmates elect nitrogen within a set time period). Petitioner's proposal certainly fell short of showing a safe alternative that could be "readily implemented" by Alabama, particularly in the week before his scheduled execution.

The facts of this case cast serious doubt on the Eleventh Circuit's suggestion that the State bears a heavy burden of showing that a method of execution is unavailable as soon as its legislature authorizes it to employ a new method. That kind of burden-shifting framework would perversely incentivize States to delay or even refrain from approving even the most humane methods of execution.

As for petition No. 18–8766—the challenge to the original order denying petitioner a preliminary injunction—and its accompanying stay application, four Justices noted, without explanation, that they would have stayed the execution to allow consideration of this petition as well. It is unclear what legal issue they believed warranted our review. Petitioner did not identify a lower court conflict on an important question of law—certainly not one passed on by the Eleventh Circuit. Instead, petitioner asked the Court to engage in mere error correction about the scope of evidence that the District Court may consider in deciding whether to grant a preliminary-injunction motion, and about the scope of appellate review. The dissenting Justices made no attempt to explain how those issues warranted our review.

For these reasons, our decisions to vacate the stays entered by the lower courts and decline to grant a stay were undoubtedly correct.

## III

Given petitioner's weak position under the law, it is difficult to see his litigation strategy as anything other

than an attempt to delay his execution.  Yet four Members
of the Court would have countenanced his tactics without
a shred of legal support.  Indeed, JUSTICE BREYER's six-
page dissent musters only one, nonprecedential case cita-
tion for a proposition of law.  See *Price*, 587 U. S., at ___
(slip op., at 6) (citing *Bowersox* v. *Williams*, 517 U. S. 345,
347 (1996) (GINSBURG, J., dissenting)).  To be sure, the
dissent gestures at a compressed timeframe, as if to sug-
gest the legal issues were too complicated to allow rea-
soned consideration before the State's execution warrant
expired.  But as explained above, the legal issues were
remarkably straightforward.  And any blame for decisions
"in the middle of the night," 587 U. S., at ___ (slip op., at
7), falls on petitioner, who filed the new preliminary in-
junction motion that resulted in the stays just *five hours*
before his execution.

Insofar as JUSTICE BREYER was serious in suggesting
that the Court simply "take no action" on the State's
emergency motion to vacate until the following day, *id.*, at
___ (slip op., at 4), it should be obvious that *emergency*
applications ordinarily cannot be scheduled for discussion
at weekly (or sometimes more infrequent) Conferences.
This approach would only further incentivize prisoners to
file dilatory challenges to their executions by rewarding
them with *de facto* stays of execution while requiring
timely petitioners to meet the ordinary legal standards for
a stay.  JUSTICE BREYER's approach would also have sig-
nificant real-world consequences.  It would hamper the
States' ability to carry out lawful judgments, while simul-
taneously flooding the courts with last-minute, meritless
filings.  And this practice would harm victims.  Take
Bessie Lynn, Bill's widow who witnessed his horrific slay-
ing and was herself attacked by petitioner.  She waited for
hours with her daughters to witness petitioner's execution,
but was forced to leave without closure.  See Alabama,
Running Out of Time, Halts Execution of Sword and Dag-

ger Killer of Pastor," CBS News, (Apr. 12, 2019), https://www.cbsnews.com / news / alabama - sword - dagger - killer - christopher - lee - price - execution - halted - pastor - bill - lynn/ (all Internet materials as last visited on May 9, 2019); Execution Called Off for Christopher Price; SCOTUS Decision Allowing It Came Too Late (Apr. 11 2019), https://www.al.com/news/birmingham/2019/04/ christopher-price-set-to-be-executed-thursday-evening-for-1991-slaying-of-minister.html. This "injustice, in the form of justice delayed," *ibid.*, would become the norm if the Court were to regularly delay resolution of emergency applications.

Of course, the dissent got its way by default. Petitioner's strategy is no secret, for it is the same strategy adopted by many death-row inmates with an impending execution: bring last-minute claims that will delay the execution, no matter how groundless. The proper response to this maneuvering is to deny meritless requests expeditiously. The Court instead failed to issue an order before the expiration of the warrant at midnight, forcing the State to "cal[l] off " the execution. *Price*, 587 U. S., at \_\_\_ (slip op., at 5). To the extent the Court's failure to issue a timely order was attributable to our own dallying, such delay both rewards gamesmanship and threatens to make last-minute stay applications the norm instead of the exception. See *Bucklew*, 587 U. S., at \_\_\_ (slip op., at 30).

Perhaps those who oppose capital punishment will celebrate the last-minute cancellation of lawful executions. But "[t]he Constitution allows capital punishment," *id.*, 587 U. S., at \_\_\_, (slip op., at 8), and by enabling the delay of petitioner's execution on April 11, we worked a "miscarriage of justice" on the State of Alabama, Bessie Lynn, and her family. Governor Ivey Releases Statement on Stay of Execution for Death Row Inmate Christopher Lee Price, (Apr. 12, 2019), https://governor.alabama.gov/statements/

THOMAS, J., concurring

governor - ivey - releases - statement - on - stay - of - execution-
for-death-row-inmate-christopher-lee-price.